Odessa H. KNAUFF, as Executrix of the Estate of Walter G. Knauff, deceased, W. Duncan Pyle and Vern E. Lantow, Plaintiffs,

Commercial Security Bank, as Administrator of the Estate of Maude Carruth, deceased, New Park Mining Company, East Utah Mining Company and Max J. Johnson, Intervening Plaintiffs,

v.

UTAH CONSTRUCTION & MINING CO., a corporation, William Henry Harrison Cranmer, Robert L. Cranmer, Allen D. Christensen, Edmund W. Littlefield and Lincoln G. Kelly, Defendants.

Civ. No. 4627.

United States District Court
D. Wyoming.

Oct. 2, 1967.

Lathrop & Lathrop, Loomis, Lazear, Wilson & Pickett, Cheyenne, Wyo., Feder, Morris & Feder, Denver, Colo., Edgar J. Schoen, Chicago, Ill., for plaintiff Odessa H. Knauff, as Executrix of Estate of Walter G. Knauff, deceased.

Lathrop & Lathrop, Cheyenne, Wyo., Feder, Morris & Feder, Denver, Colo., Edgar J. Schoen, Chicago, Ill., for plaintiffs W. Duncan Pyle and Vern E. Lantow.

Loomis, Lazear, Wilson & Pickett, Cheyenne, Wyo., Strong & Hanni, Salt Lake City, Utah, for intervening plaintiff Maude Carruth (before her death which occurred several months prior to trial) and Commercial Security Bank, as Administrator of Estate of Maude Carruth, deceased, and for intervening plaintiffs New Park Mining Co., East Utah Mining Co. and Max J. Johnson.

Wehrli & Williams, Casper, Wyo., Bruce T. Mitchell, San Francisco, Cal., Pillsbury, Madison & Sutro, San Francisco, Cal., for defendant Utah Const. & Mining Co.

Henderson & Godfrey, Cheyenne, Wyo., Mulliner, Prince & Mangum, Salt Lake City, Utah, Wehrli & Williams, Casper, Wyo., for defendants William Henry Harrison Cranmer and Robert L. Cranmer.

Henderson & Godfrey, Cheyenne, Wyo., Mulliner, Prince & Mangum, Salt Lake City, Utah, for defendant Edward K. Bachman, Executor of Estate of William Henry Harrison Cranmer, Deceased.

Wehrli & Williams, Casper, Wyo., Pillsbury, Madison & Sutro, San Francisco, Cal., for defendants Allen D. Christensen and Edmund W. Littlefield.

Guy, Phelan, Williams, White & Mulvaney, Cheyenne, Wyo., Ray, Rawlins, Jones & Henderson, Salt Lake City, Utah, Wehrli & Williams, Casper, Wyo., for defendant Lincoln G. Kelly (who was dismissed by order of court before trial).

Wehrli & Williams, Casper, Wyo., Pillsbury, Madison & Sutro, San Francisco, Cal., for defendant First Nat. Bank of Nevada at Reno (dismissed by order of court before trial).

KERR, District Judge.

## FINDINGS OF FACT

1. This is an action for equitable relief voiding a merger and impressing certain properties in a constructive trust for the benefit of the plaintiff and intervenors and others in their alleged class. In the alternative, it is an action affirming the contract of purchase or sale (the merger agreement) and seeking damages for the plaintiff and intervenors. Jurisdiction is invoked under the Securities Exchange Act of 1934 and Rule 10(b)-5 thereunder. 15 U.S.C. § 78b, 17 C.F.R. 240.10B-5. The plaintiff and intervenors also seek to impose jurisdiction under 28 U.S.C. § 1655 (proceedings to impose liens and claims against real and personal property located in the District of Wyoming). In Claim II of their Amended Complaint, the plaintiff and intervenors set forth certain allegations which they claim constitute a common law cause of action over which the Court has pendent jurisdiction.

2. Plaintiff, Odessa H. Knauff, is the duly appointed, qualified and acting

executrix of the estate of Walter G. Knauff, deceased. At the time of the commencement of the within action, and at the time of his death, said decedent was a citizen of the state of Colorado.

3. Commercial Security Bank of Ogden, Utah, is the duly appointed, qualified and acting administrator of the estate of Maude Carruth, deceased. At the time of the commencement of the within action and at the time of her intervention therein, said decedent was a citizen of the State of Utah.

4. New Park Mining Company, hereinafter referred to as New Park, is a corporation organized under the laws of the State of Nevada.

5. East Utah Mining Company, hereinafter referred to as East Utah, is a corporation organized under the laws of the State of Utah.

6. Max J. Johnson is a citizen of the State of Utah.

7. Vern E. Lantow is a citizen of the State of Colorado.

8. W. Duncan Pyle is a citizen of the State of Colorado.

9. Utah Construction & Mining Co., is a corporation organized during the year 1956 under the laws of the State of Delaware which, when organized, became corporate successor to the Utah Construction Company, which was organized in 1900 as a corporaticn under the laws of the State of Utah. Utah and its predecessor corporation both did business in the State of Wyoming. Both Utah and its predecessor corporation are hereinafter referred to as "Utah".

10. William Henry Harrison Cranmer at the time of the commencement of the within action, was a citizen of the State of New York. On May 2, 1967, he died in New York City. The Court was informed of his death on May 3, 1967. No appearance was made on behalf of the estate of William Henry Harrison Cranmer, deceased. Said estate was not served or substituted in this matter and the Court has never acquired jurisdiction over it. On the 8th day of September, 1967, Edward K. Bachman, Executor of the estate of William Henry Harrison Cranmer, deceased, was substituted as a defendant for the said William Henry Harrison Cranmer, deceased, in the event that a re-trial of this case be ordered by an appellate court.

11. Robert L. Cranmer, at the time of the commencement of the within action, was a citizen of either the State of Nevada or the State of Utah and now resides in the State of California.

12. Allen D. Christensen, hereinafter referred to as Christensen, is a citizen of the State of California.

13. Edmund W. Littlefield, hereinafter referred to as Littlefield, is a citizen of the State of California.

14. On or about September 13, 1953, Neil E. McNeice discovered the Lucky Mc uranium property in the Gas Hills District near Riverton, Wyoming. He became associated with other residents of Wyoming in order to stake and develop the Lucky Mc claims. This Lucky Mc Group included Neil E. McNeice, Lowell A. Morfeld, and R. Lauren Moran. On May 18, 1954, the Lucky Mc Group entered into an agreement with William Henry Harrison Cranmer and his associates to develop the Lucky Mc properties.

15. In 1954, plaintiff Max Johnson put the original developers of the Lucky Mc properties into contact with Mr. W. H. H. Cranmer, president of New Park. For this service Mr. Johnson received 40,000 shares of stock in Lucky Mc.

16. In the initial negotiations with the original Lucky Mc developers, New Park was to take over the operation of the Lucky Mc property as a mine, with the ore to be sold to the Government. It soon became apparent, however, that a mill to produce uranium oxide concentrate would be necessary to develop the Lucky Mc properties. New Park could not undertake such a large project. Therefore, in 1954 a new corporation, Lucky Mc Uranium Corporation, was

formed with W. H. H. Cranmer as president and with New Park and other corporations and persons as financial contributors. Lucky Mc Uranium Corporation, hereinafter called Lucky Mc, was organized under the laws of the State of Nevada and was doing business in the State of Wyoming from 1954 to 1960. In early 1960, it merged with Utah Construction & Mining Co.

17. The original Lucky Mc developers relied upon the ability and integrity of W. H. H. Cranmer personally and required that he have a substantial personal participation in the Lucky Mc venture. They did not rely on New Park or any of the other corporations who were investing in the Lucky Mc corporation.

18. W. H. H. Cranmer was president and director of Lucky Mc until February 1957, and was an officer and director of Lucky Mc from February 1957, through the time of its merger with Utah. His son, Robert L. Cranmer, was an officer and director of Lucky Mc from its inception through the time of its merger with Utah. Under the Cranmers, the Lucky Mc property was mined. The Cranmers made every effort to develop the property and to interest others in developing it so that an AEC contract could be obtained and a uranium processing mill could be built. Many potential investors were brought to look at the property, but none became interested in developing it.

19. By midsummer of 1955, Lucky Mc had a small open-pit mine and had been attempting without success to develop a uranium mining and milling operation and to obtain an AEC contract for the purchase of uranium oxide concentrate. It had been unable to negotiate a suitable deal with any capable companies and was on the verge of failure. Its mining operations had been unsuccessful. It had little or no cash with which to operate. After unsuccessful attempts to interest other companies in undertaking the development of the Lucky Mc properties, it contacted Utah to interest it in developing the Lucky Mc properties.

20. After investigating the Lucky Mc properties, Utah entered into an option agreement with Lucky Mc dated September 27, 1955. The agreement provided that Utah could obtain 60 per cent of the outstanding stock of Lucky Mc upon the performance of certain acts, including the following: (a) exploration; (b) securing of financing in the amount of $5,000,000; (c) securing an AEC contract; and (d) providing working capital in a sum not to exceed $300,000, less the amounts actually expended for exploration.

21. In a companion agreement also entered into on September 27, 1955, Utah and the Lucky Mc shareholders agreed that all claims or other interests within 25 miles of Lucky Mc acquired by any of the principal Lucky Mc shareholders and option holders must be offered to Lucky Mc at cost. Under the terms of that agreement the extent of the Lucky Mc venture was defined and potential problems of conflict of interest between the parties with respect to other mining ventures were disposed of or resolved. Pursuant to this contract, Utah prospected, acquired and turned over to Lucky Mc at cost properties containing approximately two-thirds of the uranium reserves which Lucky Mc had at the time of the merger.

22. The original contract was for six months with an option to extend it for another six months to September 27, 1956. Utah was unable to complete the financing and obtain the AEC contract by September 27, 1956. An additional $5,000,000 in financing for a total of $10,000,000 was required; Utah undertook to obtain and did obtain that extra $5,000,000 financing without further cost to the Lucky Mc shareholders or any dilution of their equity. In consideration thereof and in order to give sufficient time to negotiate the AEC contract and complete the additional financing, the option agreement was extended to March 1957.

23. Utah performed everything it was required to do under its contract with Lucky Mc; the financing arrangements were completed, and the AEC contract was executed. On February 27, 1957, Utah exercised its option, took possession of the shares representing its 60 per cent interest in Lucky Mc, and placed five of its men on a nine-man board of directors of Lucky Mc. The other four directors were W. H. H. Cranmer, Robert L. Cranmer, Lowell A. Morfeld and Neil McNeice.

24. Prior to February 27, 1957, when Utah exercised its option and took possession of its Lucky Mc shares, Lucky Mc changed the par value of its shares from $1 to ten cents pursuant to the request by Utah and upon advice of W. H. H. Cranmer's independent counsel and Lucky Mc's independent certified public accountants, so that the shares issued pursuant to the option agreement could be accounted for by both Utah and Lucky Mc in accordance with proper and sound accounting principles. The change did not affect any shareholders' equity interest, and could not affect any tax liability of Utah upon the exercise of its option. The change in par was not concealed from the Lucky Mc shareholders; the question of such change was presented by W. H. H. Cranmer, president of Lucky Mc, to the Lucky Mc stockholders, and on February 21, 1957, at a special meeting of the stockholders, the change in par value was approved. On February 27, 1957, an explanation of the change of par was sent to all Lucky Mc shareholders along with the opinion of Lucky Mc's independent certified public accountants concerning the change.

25. The exercise of the option by Utah was properly set up on the books of Utah and Lucky Mc showing that Lucky Mc issued 3,638,748 shares of its stock to Utah for a cost to Utah of $363,875.

26. In order to obtain the necessary $10,000,000 financing, the banks that extended the $10,000,000 credit required Utah to do the mining, the milling and the construction work; they required Utah to enter into contracts with Lucky Mc whereby Utah would guarantee maximum costs for mining, milling and construction and guarantee the presence of sufficient uranium ore in the ground. In other words, Utah was required to guarantee that Lucky Mc would pay off the $10,000,000 loan from the difference between the price paid by the AEC for uranium oxide concentrates and the maximum cost for mining, milling and construction guaranteed by Utah. In making its guarantees to the bank to do the mining, milling and construction work for Lucky Mc, Utah assumed substantial risks.

27. As soon as the Lucky Mc mill was constructed and had been in operation a sufficient length of time to give actual cost data, Utah requested and received permission from the banks that the contracts be amended to reduce substantially the cost of mining and milling to Lucky Mc. The original contracts were reviewed with and approved by the board of directors of Lucky Mc prior to the time Utah finally exercised its option and placed its men on the board of Lucky Mc. These amendments substantially increased the profits to the Lucky Mc shareholders, but because of tax benefits, they represented a small sacrifice on the part of Utah. The mill having already been constructed, the construction contract was not changed.

28. The Lucky Mc mill began operations February 28, 1958; the contracts were amended as of June 1, 1958, just slightly more than three months after the mill came into operation. In connection with the amendments of the contracts, construction equipment which Lucky Mc had been renting from Utah was sold to Lucky Mc at a sales price which was established by an independent appraisal.

29. The total profit made by Utah upon mining, milling and construction, including interest charges and profit on the rental and sale of equipment, was just over 10 per cent before taxes. This percentage of profit does not include overhead expenses of the parent company. The quality of Utah's mining,

milling and construction work was outstanding. The total profit Utah made was reasonable and not unconscionable.

30. In May of 1959, Mr. Littlefield proposed to the executive committee of Utah that it consider a merger with Lucky Mc. The executive committee was composed of Allen D. Christensen, Marriner Eccles and Edmund W. Littlefield. Mr. Littlefield suggested the ratio of nine shares of Lucky Mc stock to one share of Utah stock. The executive committee was receptive to the idea of merger, but rejected as unfair to Utah the ratio of 9 to 1. Mr. Christensen rejected the idea of any merger at a ratio of less than 12 to 1.

31. Mr. Littlefield instructed the treasurer of the company, Mr. Orville L. Dykstra, to make a study of what a fair merger ratio should be, that is, to make a reasonable valuation of the comparative values of shares of stock in Utah and Lucky Mc. Mr. Dykstra began his study in mid-June 1959; it was in three parts, which were completed and submitted to Mr. Littlefield on June 17, July 22 and July 23, 1959, respectively. In performing his study, Mr. Dykstra acted in good faith; he was not advised that Mr. Littlefield had recommended a ratio of 9 to 1, nor of its rejection by the other members of the executive committee, nor the statement of Mr. Christensen that the ratio should be no less than 12 to 1.

32. Tapping the experience of the heads of the various departments within Utah to appraise the worth of the particular portions of Utah's operations for which they were responsible, and using three separate approaches to arrive at his evaluation, Mr. Dykstra concluded that the ratio should be no more favorable to Lucky Mc than twelve shares of Lucky Mc to one share of Utah stock.

33. Mr. Dykstra explained his conclusions to Mr. Littlefield, who submitted them to the Utah board of directors. They indicated that they would accept a 12 to 1 merger ratio.

34. During the summer while Mr. Dykstra was preparing his evaluation studies, Mr. Littlefield approached Mr. Moran and W. H. H. Cranmer with the subject of merger, but he did not mention a specific merger ratio. He gave to W. H. H. Cranmer, on behalf of the minority shareholders, charts setting out financial data of Utah and Lucky Mc. The Lucky Mc shareholders recognized the desirability of a merger with Utah and they began investigating the facts to determine what a fair merger ratio should be. Those shareholders, including W. H. H. Cranmer, Robert Cranmer, Mr. Moran, Mr. McNeice and Mr. Morfeld, met among themselves on several occasions to discuss the merger ratio.

35. On September 20, 1959, Mr. Littlefield and Mr. Mecia of Utah met with the major Lucky Mc minority shareholders for an all-day bargaining session. Mr. McNeice, Mr. Morfeld, Mr. Moran, Mr. W. H. H. Cranmer and, for part of the time, Robert Cranmer, were present at that meeting. Answering questions by the Lucky Mc shareholders concerning Utah, Mr. Littlefield gave them all the information that they sought concerning Utah and Lucky Mc. During the course of these discussions, the original Lucky Mc shareholders proposed ratios of 7 to 1 and 8 to 1; the representatives of Utah proposed a 12 to 1 ratio. The confidential report of Mr. Dykstra to top Utah management had said that a 12 to 1 ratio was fair. After the original Lucky Mc shareholders withdrew and held a caucus they proposed a merger ratio of 10 to 1 which Mr. Littlefield persuaded the board of directors to accept.

36. The original Lucky Mc shareholders as a group were completely familiar with the operation of Lucky Mc and were experienced in mining ventures in general and the uranium industry in particular. That group consisted of W. H. H. Cranmer, Robert L. Cranmer, Neil E. McNeice, Lowell A. Morfeld and R. Lauren Moran, Esq. They were stockholders of Lucky Mc. They were not stockholders of Utah and they were independent of Utah. The bargaining be-

tween the representatives of Utah and the original Lucky Mc shareholders was carried on at arm's length.

37. The original Lucky Mc group, McNeice, Morfeld, and Moran, did not join in this lawsuit although they had the most to gain. The stockholdings of the original Lucky Mc shareholders and their families at the time of the merger were as follows:

|  | Shares |
|---|---|
| Robert L. Cranmer | 27,441 |
| Robert L. Cranmer and Claire C. Cranmer | 19,700 |
| Robert L. Cranmer, as custodian for Antony Rhoades Duke | 600 |
| Robert L. Cranmer, as custodian for Catherine Wood Cranmer | 2,450 |
| Robert L. Cranmer, as custodian for Lillian Claire Cranmer | 2,450 |
| Robert L. Cranmer, as custodian for Clive Cranmer Duke | 600 |
| Robert L. Cranmer, as custodian for Loring Castleton Cranmer | 2,450 |
| Robert L. Cranmer, as custodian for Thomas L. Cranmer | 3,050 |
| Robert L. Cranmer, as custodian for William Robert Castleton Cranmer | 2,450 |
| Robert L. Cranmer, as custodian for William H. H. Cranmer IV | 3,050 |
| Robert L. Cranmer, as trustee for Mrs. Virginia Lambert Johnson | 600 |
| Robert L. Cranmer, as custodian for Lane C. Wille | 600 |
| W. H. H. Cranmer | 130,700 |
| Neil E. McNeice and H. Maxine McNeice | 271,000 |
| R. Lauren Moran | 32,000 |
| R. Lauren Moran, custodian for Roberta Marilyn Moran | 1,000 |
| Lowell A. Morfeld and Frances Mary Morfeld and Debby Frances Morfeld | 1,000 |
| Lowell A. Morfeld and Frances Mary Morfeld and Sharon Kaye Morfeld | 1,000 |
| Lowell A. Morfeld and Frances Mary Morfeld and Terry Lowell Morfeld | 1,000 |
| Lowell A. Morfeld | 166,100 |

38. W. H. H. Cranmer, Robert L. Cranmer, McNeice, Morfeld and Moran bargained on behalf of themselves and the other minority stockholders of Lucky Mc at arm's length with Edmund W. Littlefield, who represented Utah; they took into consideration relative market values, earnings, book values, dividend history and prospects concerning Lucky Mc and Utah. They concluded that the ratio of 10 to 1 was fair and adequate.

39. The merger ratio of 10 shares of Lucky Mc to one share of Utah was fair, equitable and reasonable to the minority stockholders of Lucky Mc and to the stockholders of Utah.

40. On or about December 18, 1959, a merger agreement was drawn up. The merger agreement and the proxy statement dated January 5, 1960, describing the two companies and their financial data were sent to the shareholders of Lucky Mc and Utah.

41. The merger statement consists of 31 pages and in addition contains a cover letter incorporated as part of the printed statement. The proxy statement sent to the shareholders of Lucky Mc and Utah was identical except for the covering letter. The proxy statement contained a description of the proposed merger, a description of Utah and Lucky Mc with financial data for both companies, and a history of the dealings between Lucky Mc and Utah. In addition, it contained accounting statements for both companies prepared by their respective independent certified public accountants, a copy of the merger agreement, and extracts from the law of the States of Delaware and Nevada relating to the rights of dissenting stockholders of Lucky Mc and Utah respectively.

42. The proxy statement was prepared by Utah management and reviewed by Lucky Mc management. It was signed by Robert L. Cranmer in his official capacity of Secretary of Lucky Mc Uranium Corporation, in good faith, believing the truth of the matters and things stated therein. The financial statements in the proxy statement were prepared by independent certified public accountants for Utah and for Lucky Mc and all the financial data was prepared in consultation with those accountants. The entire proxy statement was reviewed by Utah's independent legal counsel which advised that the proxy statement was adequate and proper. All the information necessary for an informed decision concerning the proposed merger was set forth in the proxy statement.

43. The merger was thereafter approved by the Lucky Mc shareholders. 5,214,517 shares voted in favor of the merger and 66,968 voted against it. On January 29, 1960, the merger between Utah and Lucky Mc was approved by the shareholders of both corporations.

44. The matters and things contained in the proxy statement are true and are adequately set forth so as not to be misleading in any material aspect. The proxy statement contained no misstatements of material fact. It did not omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. The findings herein that statements are not false or misleading includes the finding that such statements did not contain any untrue statement of a material fact and did not omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

45. The covering letter from Robert L. Cranmer to the stockholders of Lucky Mc dated January 5, 1960, which forms the cover of the proxy statement sent to the Lucky Mc shareholders is not false or misleading, and it accurately and sufficiently sets forth reasons why the merger was advisable.

46. The proxy statement did not have to state expressly that one of the reasons for the merger was to eliminate possible conflicts of interest by removing any problems with the minority shareholders. It was sufficient to set forth the elimination of conflicts and problems with the minority shareholders in paragraphs A, B, and C on the cover page of the proxy statement.

47. It is the necessary result of any merger that the entire cash flow from any one of the predecessor companies will be available to the surviving company. The cash flow generated by Lucky Mc is set forth in the proxy statement. It was not false or misleading to omit from the proxy statement an express statement that this cash flow would be available to the surviving company; this result would necessarily follow the merger.

48. It was not necessary nor required that a statement pertaining to increasing

the marketability of Utah stock through the acquisition of widely scattered stockholders be expressly set forth in the merger proxy statement. If that were a purpose of Utah for the merger, it is not material to Lucky Mc shareholders, nor is it relevant to the advisability of merger or the fairness of the merger ratio. The proxy statement was not false or misleading in failing to set forth that alleged purpose.

49. It was not a purpose of the merger that Utah desperately needed the cash flow of Lucky Mc in order to develop its other properties, in particular, the Marcona complex, and the proxy statement was not false or misleading in failing to set forth such alleged purpose for the merger.

50. At the time of the merger Utah believed there would be no tax liability to it or tax benefit to Lucky Mc arising out of the exercise of the option. There was no bad faith in Utah's tax treatment of the option. It was not a purpose of Utah to offset any tax liability of Utah arising out of the exercise of its option in February 1957 to acquire a 60 per cent interest in Lucky Mc against tax benefits accruing to Lucky Mc. The proxy statement was not false or misleading in failing to set forth such alleged purpose.

51. Plaintiffs submitted no evidence that proved that the portions of the proxy statement entitled "Notice of Special Meeting of Stockholders to be held January 29, 1960", "Proxy Statement for Special Meeting of Stockholders—January 29, 1960", and "Action to be taken at the Meeting" (proxy statement, pp. 1–2) are false and misleading. Those portions of the proxy statement are not false or misleading.

52. The portion of the merger proxy statement entitled "Basis of Merger" (proxy statement, p. 2) is not false or misleading. As stated in that section, the rate of exchange (merger ratio) was determined by arm's length bargaining between the management of Utah and the principal stockholders of Lucky Mc.

53. Plaintiffs submitted no evidence that showed that the sections of the proxy statement entitled "Effectiveness of Merger", "Abandonment of Merger" and "Capitalization" (proxy statement, pp. 2–3) are false or misleading. Those sections are not false or misleading.

54. The section of the proxy statement entitled "Earnings" (proxy statement, pp. 3–4), including the presentation of the figures on page 4 of the proxy statement, is not false or misleading. This portion of the proxy statement contains four subsections: The first two concern Utah and fully and fairly gave the financial picture of its operations for the years 1955 through 1959, as shown therein. That financial picture is properly presented as "Gross revenue from operations", plus "Other income", less "Costs and Expenses", and "Provision for Federal income taxes" from which is derived a "Net income" and a "Net income" per share. To that net income is added, "Utah's equity in undistributed earnings of subsidiary and affiliated companies" to derive a "Combined net income" and an "Amount per share". The third subsection fully and fairly sets forth the financial picture of Lucky Mc. It shows Lucky Mc's "Gross Sales", less "Costs and expenses", and "Provision for Federal income taxes". Also shown is the Net income and the Net income per share. The fourth subsection is a pro forma combined presentation showing what Lucky Mc would have contributed to Utah during the years in question had the two companies been merged.

55. The figures on page 4 of the proxy statement and those contained in the Lucky Mc statement of income and retained earnings at page 22 of the proxy statement fully set forth the cash flow generated by Lucky Mc and the contribution of Lucky Mc's cash flow would make to Utah if the two companies were merged.

56. The Utah financial data includes under "Gross income from operations" the revenue from the sale of industrial land in South San Francisco and includes under "Other income" the revenue from the sale of construction equipment to Lucky Mc, and the revenue from the sale

of land to the Highway Department of the State of Utah and from the liquidation of housing subsidiaries; those revenues do not fall within a special category known as "extraordinary items" for accounting purposes and need not have been set forth in a different manner than contained in the proxy statement.

57. The revenues itemized in Paragraph 56, supra, are not "Extraordinary" in the light of Utah's operations: Utah sells construction equipment as part of its regular course of business and sells land as part of its regular course of business; Utah's profits from such sales can be expected to continue and have continued and reoccurred regularly from year to year. Profits from such sources are less fluctuating from year to year than are Utah's profits from construction.

58. The profit from the sale of the South San Francisco land was properly included under the heading "Gross revenue from operations" (proxy statement, p. 4). The sale of land to the State of Utah, the sale of equipment to Lucky Mc and the gain on the liquidation of housing development corporations were properly included in a separate category entitled "Other income"; the statement on page 4 is a summary of the more detailed statement on page 19 of the proxy statement. The proxy statement is not false or misleading in the manner in which it presents these items of revenue.

59. In 1958, Utah received a dividend from its subsidiary, Cia San Juan, in an amount of $825,050. In 1959, Utah returned that money to Cia San Juan in the form of a loan in the amount of $825,-000. The purpose of this transaction was to save approximately $400,000 in taxes; the transaction was not intended to mislead the Lucky Mc shareholders. The dividend from Cia San Juan did not distort the financial picture of Utah. As a dividend received, it was properly included within the heading "Other income", on page 4 of the proxy statement, and under the separate heading, "Dividends from subsidiaries and affiliates" contained in the financial statement on

page 19 of the proxy statement. If that sum had not appeared under the heading "Other income", then it would have appeared under the heading, "Utah's equity in undistributed earnings of subsidiary and affiliated companies", also set forth on page 4 of the proxy statement. The combined net income for Utah would have been the same except for such adjustment, if any, to reflect the tax savings which inspired the dividend. The proxy statement was not false or misleading in failing specifically to describe the dividend from Cia San Juan.

60. The paragraph entitled "Book Values" (proxy statement, p. 4) is not false or misleading.

61. The section entitled "Dividends" is not false or misleading. The information concerning Lucky Mc's restrictions from paying dividends under its bank loan agreements is set forth in the section entitled "Description of Capital Stock of Utah and Lucky Mc" at page 13 of the proxy statement, which describes the loan restrictions applicable to both companies. That information is again set forth in the balance sheet at page 21 of the proxy statement. Page 6 of the proxy statement states that the total revenue to Lucky Mc under the new contract with the AEC will exceed $100,000,000 and also states that the bank loan is anticipated to be retired before the end of the 1960 fiscal year. The earnings per share for 1958 and 1959 are set forth on page 4 of the proxy statement. The proxy statement gives sufficient information with respect to the potential dividend capabilities of Lucky Mc, and is not false or misleading in this regard.

62. No evidence shows that the section entitled "Market Prices" (proxy statement, p. 5) was false or misleading. That section is not false or misleading.

63. The section of the proxy statement entitled "History, Business and Properties of Lucky Mc" (proxy statement, pp. 5–7) is not false or misleading. That section accurately describes what Utah was required to do to fulfill its obligations under the option agreement between Lucky Mc and Utah entered into

in September 1955. As stated in that section, the option under the agreement of September 1955, was exercised in February 1957. If the option were exercised in September of 1956, and again in February of 1957, it would have made no material difference so far as the proxy statement is concerned, and the omission of the September 1956 date from the proxy statement is not material and is not false or misleading.

64. The section entitled "History, Business and Properties of Lucky Mc" describes also the fact that Utah constructed the mill and related facilities for a cost of approximately $7,500,000 and was doing milling and mining work at a cost plus a percentage fee. Utah's purpose in amending the mining and milling contracts was not to obtain $290,000 in mining costs which it could have collected under the terms of the original contracts. The proxy statement was not false or misleading when it did not state that the original contracts were amended and that the recoupment of $290,000 in mining costs was a reason for that amendment.

65. In connection with the amendment to the mining and milling contract, Lucky Mc purchased from Utah equipment that it had been leasing from Utah. The equipment was sold at a price established by an independent appraisal. Such appraisal was not inadequate nor improperly done, nor was it a deliberate fraud practiced by Utah upon Lucky Mc. The proxy statement was not false or misleading when it did not contain the information concerning the sale of the equipment to Lucky Mc.

66. Lucky Mc exercised reasonable business judgment in renting its equipment from Utah; the restrictions in its loan agreement may have precluded Lucky Mc from making lease purchase arrangements for the purchase of its equipment. The proxy statement was not false or misleading in this connection.

67. The profit received by Utah for its work performed for Lucky Mc was not unreasonable. Utah did not over-reach Lucky Mc with respect to interest on moneys advanced and expended under the mining, milling and construction contracts nor in renting and ultimately selling equipment to Lucky Mc. The profits on the rental and sale of equipment and profits relating to interest on monies advanced and expended under the contracts are all included in the less than eleven per cent profit, which is a reasonable profit. The proxy statement was not false or misleading in not stating that the profits received by Utah from Lucky Mc were unreasonable.

68. Utah did not overreach in connection with its transfer of the Broadway and Nuclear royalties to Lucky Mc. That transfer was made at cost and the costs were actually incurred by Utah and properly charged to Lucky Mc under the agreement to transfer such interests at costs of acquisition. The proxy statement was not false or misleading when it did not state that Utah overreached in connection therewith.

69. The alleged fraudulent omission to reveal the receipt of the $10,000.00 commission by Robert L. Cranmer in connection with the sale of an overriding royalty interest in the Broadway claims by Intermountain Petroleum, Inc. to Utah Construction & Mining Company is not a material omission since at the most it could be reflected in each share of Lucky Mc stock by two and one-half mills. That payment is immaterial and could not have reasonably affected any decision to vote favorably or unfavorably upon the merger. Utah and its executives acted in good faith in connection with the acquisition of the Broadway royalty and there were no kickbacks or inducements paid by Utah to any of the minority shareholders of Lucky Mc. Cranmer was entitled to that payment. The alleged omission was remote to the merger and not relevant thereto. The omission to set forth the facts concerning said commission was not relied upon by any stockholder in connection with the merger, nor could such fact reasonably affect the judgment of any stockholders. The proxy statement was not

false or misleading by failing to set forth that $10,000.00 payment.

70. The section of the proxy statement entitled "History, Business and Principal Properties of Utah" (proxy statement, pp. 7–11) is not false or misleading. It does not unduly emphasize the profitable portions of Utah's business. That section consists of a description, and some background data concerning principal properties of Utah. The combined performance of Utah and all Utah's subsidiary and affiliate companies, including all unprofitable operations, is set forth in the proxy statement. As stated in this section, the Marcona earnings are "after taxes". Marcona had paid all the taxes which its lawyers and accountants said that it owed, and at the time of the merger, when the proxy statement was sent to the Lucky Mc shareholders, the Government had asserted no deficiencies with respect to the years set forth in the proxy statement. The Government has since asserted a deficiency against Marcona and the accounting procedure which the Government asserts Marcona should have followed would have the effect of increasing, not decreasing, the earnings of Utah in the years in question. The proxy statement is not false or misleading in stating that the earnings of Marcona were after taxes.

71. A balance sheet statement for Marcona Mining Company, Cia San Juan, S.A., and San Juan Carriers, Ltd., need not have been included in the proxy statement.

72. The section in the proxy statement entitled "History, Business and Principal Properties of Utah", contains a description of Utah's Shirley Basin property and the use of the production quota derived therefrom for processing ore through the Lucky Mc mill. The description of Utah's Shirley Basin property is not false or misleading. The acquisition of the Shirley Basin properties was not a corporate opportunity of Lucky Mc. Utah has been in the mining business since 1944 or 1945 when it began mining in Cedar City, Utah. Since then Utah has been actively prospecting for and participating in mining ventures in the Rocky Mountain Basin area, throughout the United States and throughout the world, by itself and in partnership with others. Prior to Utah's first contract with Lucky Mc, Utah was engaged in a search for uranium properties throughout the Rocky Mountain area, and it had acquired uranium claims in the area of the Colorado-Wyoming border, and built a uranium mill. When Utah entered into its agreement with Lucky Mc, Utah and all the officers, directors and substantial shareholders and option holders in Lucky Mc entered into a companion agreement whereby all claims acquired within a 25-mile radius of the Lucky Mc properties should be turned over to Lucky Mc at cost. This agreement defined the area of the Lucky Mc venture and was intended to and did leave the parties thereto free to prospect for and acquire claims outside the 25-mile limit for their own use and development. Pursuant to this agreement, Utah prospected and acquired for Lucky Mc properties within the 25-mile area and located approximately two-thirds of the uranium reserves, ultimately held by Lucky Mc. Those properties were turned over to Lucky Mc at their cost to Utah. Utah continued to search for mining prospects as it had in the past. As a result of that search, Utah acquired uranium claims in the Shirley Basin of Wyoming. Those claims were over a hundred miles away from the Lucky Mc property and were a completely different kind of ore. Those properties belonged to Utah and Utah had no obligation to turn them over to Lucky Mc. The acquisition of the Shirley Basin properties was not a corporate opportunity of Lucky Mc and the proxy statement is not false or misleading in this regard.

73. The remaining sections of the proxy statement entitled, "Construction Activities and Land Development", "Description of Capital Stock of Utah and Lucky Mc", "Tax Consequences" and "Rights of Dissenting Stockholders", are not false or misleading.

74. The Internal Revenue Service assessed against Utah an additional $642,-311.67 in taxes with respect to the years 1952 and 1953. Utah knew of that assessment prior to the merger. The sum of $804,815.01 was paid on July 11, 1960. The proxy statement need not have set forth the fact of that assessment and its amount. At the time of the merger, Utah had reserves for Federal taxes well in excess of that amount. That reserve was shown in the Utah balance sheet contained in the proxy statement as a liability of Utah. As such it reduced the value of Utah as compared with Lucky Mc. The proxy statement gave a conservative picture of Utah's financial position with respect to taxes and was not false or misleading with respect to the foregoing assessment of tax.

75. There was no tax detriment to Utah nor tax benefit to Lucky Mc in connection with the exercise of Utah's option to acquire 60 per cent of the Lucky Mc stock. At the time of the merger, Utah and Lucky Mc were subject to audit by the Internal Revenue Service for the years 1957, 1958 and 1959. During this period, Utah exercised its option to acquire sixty per cent of the stock of Lucky Mc. In paying its taxes with respect to that transaction and its other transactions during this period, Utah acted in good faith that it was paying all the taxes it owed with respect to the transactions which occurred during the period 1957, 1958 and 1959. The Internal Revenue Service had not asserted any deficiency with respect to those years at any time prior to the merger. Utah had substantial reserves for possible tax liabilities which were reflected in the balance sheets contained in the proxy statement as a liability and which reduced the value of Utah as compared to Lucky Mc. Those reserves were more than adequate to cover possible tax deficiencies for all the years involved. The proxy statement was not false or misleading with respect to the tax consequence of Utah's exercise of the option.

76. The proxy statement does not state that an appraisal was made by persons outside Lucky Mc or Utah and in this regard was not false or misleading.

77. The Ditchburn Economic Appraisal Report of Lucky Mc was a report about Lucky Mc put out by an independent stock brokerage house in New York City to the public. Utah believed it was inaccurate and badly prepared. Mr. Littlefield sent a copy of the Report to Mr. W. H. H. Cranmer on behalf of the Lucky Mc minority shareholders. The Ditchburn Report was not concealed. In failing to recite the conclusions of the Ditchburn Report, or portions thereof, the proxy statement was not false or misleading.

78. The proxy statement was not false or misleading in failing to set forth the holdings of Mr. Christensen and Mr. Littlefield in the Marcona complex or that each of them had substantial stock holdings in Utah. Mr. Christensen owned 11 per cent of the stock of the Marcona complex and Mr. Littlefield owned less than 1 per cent. Mr. Christensen and Mr. Littlefield acted in good faith, and their holdings in Marcona, and in Utah did not cause them to commit fraud upon the Lucky Mc minority shareholders.

79. The fact that Lucky Mc and Utah stock had never been registered under Federal Securities laws was not concealed; neither Lucky Mc nor Utah was required to be so registered. The alleged omission to reveal that Lucky Mc and Utah stock had never been registered under Federal Securities Laws is not a material omission and was not relied upon by any stockholder nor could such fact reasonably affect the judgment of any stockholder. In this regard, the proxy statement is not false or misleading.

80. Following the narrative portion of the proxy statement are financial statements. On pages 16 and 17 of the proxy statement is the combined pro forma balance sheet for Utah and Lucky Mc; on pages 18 and 19, the balance sheet for Utah; and on pages 20, 21 and 22, the balance sheet for Lucky Mc. The balance sheet for Utah and for Lucky Mc and the pro forma combined balance sheet

were prepared by independent certified public accountants. The balance sheets are an effort in good faith properly to present the financial picture of Utah and of Utah and Lucky Mc combined, and are not false or misleading.

81. The agreement of merger is Exhibit A to the proxy statement (proxy statement, pp. 23–29), and portions of Delaware and Nevada law applicable to Utah and Lucky Mc, respectively, dealing with the appraisal rights of shareholders are set forth as Exhibit B (proxy statement, pp. 30–31).

82. The merger ratio of ten shares of Lucky Mc stock to one share of Utah stock was fair to the Lucky Mc stockholders and to the Utah stockholders. The merger benefited the shareholders of Lucky Mc by taking them out of a speculative uranium company with a one-product industry and with an uncertain future, and by making them part of a substantial, broad-based, and diversified company whose operations in perpetuity were virtually assured and whose management was experienced in diversification. The merger benefited the shareholders of Utah by eliminating potential conflicts of interest between the two companies, increasing the amount of cash flow available to the surviving company, through savings in elimination of taxes upon intercompany dividends, and increasing efficiency in mining and construction operations.

84. Even if the material sent to all the Lucky Mc shareholders in connection with the merger were false and misleading (the court finds that such material was not false or misleading), the Lucky Mc shareholders were not damaged because the 10-to-1 merger ratio was fair and reasonable.

85. None of the plaintiffs was misled by the proxy statement nor by any of the defendants, in connection with their vote upon the merger or in any action which they took.

86. On January 29, 1960, plaintiffs, Walter G. Knauff, W. Duncan Pyle and Vern E. Lantow, voted against the merger. Prior to receiving the proxy statement they determined that in their opinion the merger was not to Lucky Mc's advantage, and accordingly voted against the merger. Mr. Knauff knew of his right to have his stock appraised, but preferred to keep his stock and institute a lawsuit against Utah; he so informed Utah by letter. Mr. Pyle and Mr. Lantow were in accord. None sought to exercise his right of appraisal set forth in the proxy statement.

87. Plaintiffs Knauff, Pyle and Lantow were not misled by the proxy statement. Mr. Knauff, after receiving the proxy statement, did not favor the merger and made a detailed presentation in opposition to the merger based upon the material in the proxy statement. Messrs. Pyle and Lantow were friends of Mr. Knauff and discussed the merger with him.

88. On January 29, 1960, the remaining intervenors, Maude Carruth, deceased, New Park Mining Company, East Utah Mining Company, and Max J. Johnson, voted in favor of the merger. The decision of intervenors New Park and East Utah to vote favorably on the merger was not affected by any portion of the proxy statement or any representation by Utah or Allen D. Christensen or Edmund W. Littlefield. At the time of the merger, defendant W. H. H. Cranmer was the chief executive of New Park and East Utah. The Cranmers were thoroughly familiar with the factual background of Utah and Lucky Mc and the merger. In addition, the merger was discussed with the board of directors of both companies.

89. Max Johnson received his shares of Lucky Mc stock as a finder's fee for bringing the Lucky Mc properties held by McNeice, Moran and Morfeld to the attention of W. H. H. Cranmer. He was familiar with Lucky Mc from a date prior to the time Utah first had any dealings with Lucky Mc and remained familiar with the operation thereafter. In deciding to vote in favor of the merger, Max Johnson did not rely upon the proxy statement or upon any representation

made by Utah or Allen D. Christensen or Edmund W. Littlefield. He discussed the merger with stock brokers and reviewed the data with respect to Utah.

90. Maude Carruth was not connected with Lucky Mc or Utah in any way except as a shareholder. She bought her Lucky Mc stock as part of a general pattern of speculation in uranium stock. She did not investigate the financial representations in the proxy statement. In determining to vote in favor of the merger, Miss Carruth did not rely upon the proxy statement nor upon any representation made by the defendants or any of them.

91. Defendants did not breach any fiduciary duty to Lucky Mc or the stockholders of Lucky Mc in connection with the operation of Lucky Mc by Utah Construction Company after the exercise of the option granted in the agreement dated September 27, 1955.

92. Defendants did not withhold or deprive Lucky Mc or any of its stockholders of any corporate opportunity rightfully belonging to it or to them.

## CONCLUSIONS OF LAW

■ 1. This Court has jurisdiction over the parties and the subject matter of this action.

■ 2. In connection with the merger of Utah and Lucky Mc in January of 1960, defendants and each of them did not employ any device, scheme or artifice to defraud; did not make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and defendants and each of them did not engage in any act, practice, or course of business which operated or which would operate as a fraud or deceit, nor did they deceive any of the Lucky Mc stockholders in any material way in connection with the merger of Utah and Lucky Mc in January 1960 or otherwise.

3. All of the defendants acted in good faith in their dealings with Lucky Mc.

None of the defendants engaged in any knowing fraud or deception of any of the shareholders of Lucky Mc; none knowingly concealed any material fact in connection with the merger or knowingly made any false statement of fact in connection with the merger. There was no deliberate plan to defraud the Lucky Mc minority shareholders.

■ 4. The proxy statement dated January 5, 1960, sent by Lucky Mc and Utah to their shareholders in connection with the proposed merger of Utah and Lucky Mc did not contain any untrue statement of a material fact, and did not conceal or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

■ 5. The omission to disclose the facts concerning the $10,000 commission which the defendant Robert L. Cranmer received in connection with the sale of a 5% overriding royalty in the Broadway claims by International Petroleum, Inc. to Utah did not constitute a violation of the Securities Exchange Act of 1934 or Rule 10(b)–5 thereunder, since such facts are not material to the merger.

6. The defendants are not liable for any breach of fiduciary duty to Lucky Mc or any stockholder thereof, nor did the defendants withhold or deprive Lucky Mc or its stockholders of any corporate opportunity rightfully belonging to it or to them.

■ 7. The proxy statement did not materially affect the decision of any of the plaintiffs to vote for or against the merger.

■ 8. None of the shareholders of Lucky Mc relied to their damage on any act or omission to act by the defendants or any of them: Walter G. Knauff, Vern E. Lantow and W. Duncan Pyle did not rely on any statements contained in the merger proxy statement, rather they each voted against the merger. Accordingly they cannot represent a class of persons who allegedly relied upon said statements in voting for the merger;

Maude Carruth, New Park Mining Co., East Utah Mining Co., and Max J. Johnson all voted in favor of the merger; and in doing so they did not rely on any statements or acts of the defendants or any of them, or omissions of the defendants or any of them to act.

■ 9. The merger ratio of 10 shares of Lucky Mc stock to 1 share of Utah stock which was agreed upon in connection with the merger of Lucky Mc and Utah, was and is fair to the plaintiffs and to the stockholders of Utah and Lucky Mc.

10. The defendants did not violate any of the provisions of the Securities Exchange Act of 1934 or Rule 10(b)–5 thereunder.

11. The claims asserted by plaintiff and plaintiff-intervenors are not sustained by the evidence.

12. Plaintiff and plaintiff-intervenors are not entitled to recover in this action and no other purported member of any class is entitled to recover in this action.

13. Defendants are entitled to judgment against plaintiff and plaintiff-intervenors and for their costs of suit.