408 F.2d 958
 Odessa H. KNAUFF, as Executrix of the Estate of Walter G. Knauff, Deceased, W. Duncan Pyle, Vern E. Lantow, Commercial Security Bank, as Administrator of the Estate of Maude Carruth, Deceased, New Park Mining Company, East Utah Mining Company, and Max J. Johnson, Plaintiff and Intervenors-Appellants,
v.
UTAH CONSTRUCTION & MINING CO., a corporation, Robert L. Cranmer, Allen D. Christensen, and Edmund W. Littlefield, Defendants-Appellees.
 No. 9921.
 United States Court of Appeals Tenth Circuit.
 March 25, 1969.
 
 Carl L. Lathrop, Cheyenne, Wyo., and Glen C. Hanni, Salt Lake City, Utah (Lathrop, Lathrop & Uchner, Loomis, Lazear, Wilson & Pickett, Cheyenne, Wyo., Strong & Hanni, Salt Lake City, Utah, and Feder, Morris & Feder, Denver, Colo., on the brief), for appellants.
 John B. Bates, San Francisco, Cal. (Wehrli & Williams, William J. Wehrli, Casper, Wyo., Pillsbury, Madison & Sutro, and James F. Kirkham, San Francisco, Cal., on the brief), for appellees Utah Const. & Mining Co., Allen D. Christensen, and Edmund W. Littlefield.
 F. Seaton Prince, Salt Lake City, Utah (Henderson, Godfrey & Kline, Paul B. Godfrey, Cheyenne, Wyo., Mulliner, Prince & Mangum, and Gerald R. Miller, Salt Lake City, Utah, on the brief), for appellee Robert L. Cranmer.
 Before LEWIS, BREITENSTEIN and HICKEY, Circuit Judges.
 BREITENSTEIN, Circuit Judge.
 
 
 1
 This class action brought by a minority stockholder seeks to void a merger of two corporations and to impress certain properties with a constructive trust. In the alternative it seeks affirmance of the merger and damages because of an unfair merger ratio. Jurisdiction is invoked under § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1655 which relates to the imposition of liens. Pendent jurisdiction is asserted over certain common law claims. The trial court, sitting without a jury, held that the merger was fair and gave judgment for the defendants. The findings of fact and conclusions of law of the trial court are reported at D.C., 277 F.Supp. 564.
 
 
 2
 The plaintiff and the intervenors were minority stockholders of Lucky Mc Uranium Corporation. In 1960, Lucky Mc and defendant Utah Construction & Mining Co. merged. Utah was the surviving corporation. The defendant Robert L. Cranmer was an officer and director of Lucky Mc. The defendants Christensen and Littlefield were officers and directors of both Lucky Mc and Utah.
 
 
 3
 In 1953, McNeice discovered the Lucky Mc uranium deposit near Riverton, Wyoming. Morfeld and Moran associated with him in the operation of the mining claims. The three of them made a development contract with W. H. H. Cranmer. In 1954, the Lucky Mc company was incorporated under Nevada law. The Lucky Mc operations were unsuccessful and by the summer of 1955 it was on the verge of failure. Negotiations with Utah resulted in an option agreement whereby Utah would obtain 60% of the Lucky Mc stock. Utah was required to explore, to secure $5,000,000 in financing and a contract with the Atomic Energy Commission, and to provide $300,000 in working capital. The option expired September 27, 1956, but Utah was unable to perform within that time and the option was extended for six months. In the extension Utah agreed to secure $10,000,000 in financing. Before February 27, 1957, Utah satisfied the conditions and received the agreed number of Lucky Mc shares.
 
 
 4
 The Utah development and operation of the Lucky Mc properties were successful. In 1959, Littlefield, a director of both Lucky Mc and Utah, proposed a merger of the two companies. A merger agreement and a merger ratio of ten Lucky Mc shares to one Utah share were negotiated by Utah and a group of Lucky Mc directors who were not directors, officers, or employees of Utah. The merger agreement and a proxy statement were sent to the shareholders of each company. Subsequently, they approved the merger and it went into effect early in 1960.
 
 
 5
 The basic claim of the minority is that the defendants violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10(b)-5 promulgated thereunder, by the distribution of the merger proxy statement in which there were material nondisclosures, omissions, and misstatements. Joined therewith are claims based on alleged breaches of fiduciary duties which occurred before the merger negotiations.
 
 
 6
 Section 10 of the Act forbids interstate transactions which, in connection with the purchase or sale of securities, use any deceptive device which contravenes the rules and regulations of the Securities and Exchange Commission. SEC Rule 10(b)-5 provides in substance that, in connection with the purchase or sale of any security by the use of instrumentalities of interstate commerce or the mails, it is unlawful to (1) employ a scheme to defraud, (2) make an untrue statement of a material fact or omit to state a material fact, or (3) engage in any act which would defraud or deceive any person.[1]
 
 
 7
 We are not concerned with Section 14 of the Act, 15 U.S.C. § 78n, relating to proxies and proxy statements because neither the Utah nor the Lucky Mc stock was registered. Rule 10(b)-5 is directed solely at improper practices usually associated with the sale or purchase of securities and not at the fraudulent mismanagement of corporate affairs. Birnbaum v. Newport Steel Corp., 2 Cir., 193 F.2d 461, 464, cert. denied 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356. The words "purchase or sale" must be defined broadly. See Vine v. Beneficial Finance Company, 2 Cir., 374 F.2d 627, 634, cert. denied 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460. In our opinion they include the exchange of shares which occurs as the result of a merger. See Dasho v. Susquehanna Corporation, 7 Cir., 380 F.2d 262, 266, cert. denied 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470, and Mader v. Armel, 6 Cir., 402 F.2d 158, 161.
 
 
 8
 Apparently on the theory of pendent jurisdiction, the trial court considered the premerger activities of the defendants which are alleged to violate fiduciary duties and held that no breach had occurred. This is not a derivative suit. The plaintiff and the intervenors sue in their individual capacities but they allege corporate rather than individual injuries so far as the premerger activities are concerned. Their right to maintain an action based on those activities is questionable. See Jensen v. Voyles, 10 Cir., 393 F.2d 131, 133. We recognize that the law creates fiduciary duties of corporate directors to stockholders. These duties exist independently of any sale or purchase of stock of the company. The problem is whether a breach of any such duty is cognizable under Rule 10(b)-5. See O'Neill v. Maytag, 2 Cir., 339 F.2d 764, 767-768. The posture of this case is such that we are unwilling to decide the point. The trouble is that the claims of the minority group relating to allegedly deceptive premerger transactions are so commingled with claims relating to the merger and its negotiation that it is difficult to satisfactorily separate them.
 
 
 9
 In the circumstances, we shall discuss all claims, whether premerger or merger, which we deem essential to a disposition of the case; and we shall do so in the light of the recognized rule that a trial court's findings of facts and reasonable inferences therefrom will not be set aside unless clearly erroneous. Glens Falls Insurance Company v. Newton Lumber & Mfg. Co., 10 Cir., 388 F.2d 66, 70. No discussion of burden of proof will be fruitful. The trial court heard all the evidence that any party offered and made its findings on the weight of the evidence without regard to where the burden of proof lay.
 
 
 10
 We first consider the transactions which occurred before the merger negotiations. Lucky Mc sought help from Utah for exploration and development of its uranium properties. The prime requirements were money and a contract with the AEC. Utah undertook to obtain both. It secured from banks a commitment of $10,000,000 to finance Lucky Mc. In return the banks required that Utah contract with Lucky Mc for the construction of a mill and for the mining and processing of the uranium ore. Additionally, Utah was required to give the banks "satisfactory assurance that Lucky Mc Uranium Corporation shall have a sufficient net cash accumulation to repay the loans." Utah satisfied the conditions imposed by the banks and secured the financing. It also secured a contract from AEC. In accordance with the option, Utah then received 60% of the Lucky Mc stock and placed five designees on Lucky Mc's nine-director board. With this help from Utah and with the leadership provided by Utah, Lucky Mc moved from the depths of failure to the heights of success.
 
 
 11
 Before Utah exercised the option, Lucky Mc stock was changed from a $1.00 par to a ten-cent par value. The change was in accordance with sound accounting principles to avoid an improper and arbitrary increase in the valuation of Lucky Mc assets. Utah was entitled to 60% of the stock without regard to its par value. The minority group says that the change gave a tax advantage to Utah and a tax detriment to Lucky Mc. On substantial evidence the trial court held to the contrary. The minority argues that Utah's tax problems in part motivated the merger because Utah's settlement of an asserted deficiency raises the inference that Utah benefited from tax deductions to which Lucky Mc was entitled prior to the merger. Testimony presented by Utah established that the merger had no part in the settlement which Utah made with the Internal Revenue Service.
 
 
 12
 The minority group says that Utah overreached Lucky Mc in realizing substantial profits from various sources. The arrangement with the banks required that Utah construct the Lucky Mc mill and perform the mining and milling operations. The Utah books showed a total revenue from these contract operations of $23,750,000 and a total profit of $2,800,000, or about eleven percent. An independent public accountant of the firm which did the accounting work for Utah testified that this profit "certainly falls within the range of experience of similar businesses." The minority group points out that on its construction contracts between 1956 and 1959 Utah averaged a 3.1% profit and argues that this would be a reasonable profit on the Lucky Mc operations. The argument overlooks two factors. First is the substantial risk which Utah took in securing and, in effect, underwriting the $10,000,000 needed to finance the Lucky Mc business. Second, the usual construction operations from which Utah made the lower profit are not comparable with the work which Utah did for Lucky Mc. The finding of the trial court that the Utah profit was "reasonable and not unconscionable" is sustained by the evidence and is not clearly erroneous.
 
 
 13
 Attacks are made on isolated items which go to make up the total profit. These include a claim of improper profit on the lease and rental of equipment. The argument is that the equipment should have been obtained under a lease purchase arrangement whereby rentals are applied on the purchase price. A witness for Utah pointed out that a lease-purchase arrangement is a credit device and that the loan agreement with the banks restricted the amount of indebtedness which Lucky Mc could incur without approval of the banks. Testimony on the appraised value of the equipment was in conflict. The trial court found that reasonable business judgment was used in the rental of the equipment and that the sale was on the basis of an independent appraisal which was adequate and proper and which was not fraudulent. These findings have record support and must stand.
 
 
 14
 The next item concerns interest. During the construction period money advanced by Utah to Lucky Mc bore interest but money paid to Utah by Lucky Mc was interest free. This resulted from the provisions in the contracts between Utah and Lucky Mc. No attack is made on those contracts. Utah also charged Lucky Mc interest on money advanced before the exercise of the option. If this was not satisfactory to Lucky Mc, the time to object was before the culmination of the option agreement. In any event the interest received by Utah was included in the gross profit made by Utah.
 
 
 15
 The minority group also says that overreaching occurred in connection with the acquisition and transfer of the Broadway and Nuclear royalty interests. On conflicting evidence, the trial court found that the transfer was at cost, that the costs were actually incurred, and that the costs were properly charged to Lucky Mc. The fact that the court credited the independent accounting firm employed by Utah rather than the evidence of the minority group does not make its finding clearly erroneous.
 
 
 16
 The items of profits from the lease and sale of equipment, from interest charges, and from charges made on royalty acquisitions were all included within the computation of Utah's total profit. The trial court found that no overreaching occurred whether the items are considered separately or in their totality. Substantial evidence supports these findings. Not only were the transactions fair to Lucky Mc but also they had nothing to do with the purchase or sale of any security, and cannot support a claim of violation of Rule 10(b)-5. Nothing which occurred in connection with them violated any personal right of the members of the minority group.
 
 
 17
 A breach of fiduciary duty is said to have arisen from the payment of a secret commission to defendant Robert Cranmer in connection with the acquisition of royalty interests in the Broadway mining properties. Cranmer, an attorney, negotiated a sale of the royalty interests to Utah for his client Intermountain Petroleum and received from Intermountain a commission of $10,000. Utah later transferred the royalty interests to Lucky Mc. Cranmer was on the Lucky Mc board of directors. His testimony that he revealed the commission to the Lucky Mc board is not denied. Nothing in the transaction violated any fiduciary duty. The failure to mention it in the proxy statement did not violate Rule 10(b)-5.
 
 
 18
 The proxy statement lists the principal properties of Utah and includes therein an area known as Shirley Basin. In 1957, Utah Mining Corporation, a wholly owned subsidiary of Utah, acquired mining claims in Shirley Basin. The minority group says that this acquisition was a corporate opportunity of Lucky Mc.
 
 
 19
 Contemporaneously with the execution of the original option agreement made on September 27, 1955, between Utah and Lucky Mc, Utah entered into an agreement with the parties to the Lucky Mc venture defining the scope of that venture. It provided that all mining claims within 25 miles of the Lucky Mc mining properties should be acquired for the benefit of Lucky Mc and tendered to Lucky Mc at cost. Shirley Basin is located over a hundred miles from Lucky Mc and contains "a completely different type of ore." The speculation that Lucky Mc funds were used in Shirley Basin is without record support. The finding of the trial court that Shirley Basin belonged to Utah and was not a corporate opportunity of Lucky Mc is supported by substantial evidence. The minority group is attempting to revive a stale claim which does not belong to its members personally and which has nothing to do with the purchase or sale of a security.
 
 
 20
 We turn to matters having a direct bearing on the merger and the proxy statement. In May, 1959, Littlefield proposed to the Utah executive committee that it consider a merger of Utah and Lucky Mc on a 9 to 1 stock ratio. Christensen rejected the idea of a merger at a ratio of less than 12 to 1. Dykstra, the treasurer of Utah, was instructed to make a study of the comparative value of Utah and Lucky Mc shares. After a comprehensive analysis taking several weeks time, he came up with a ratio of 12 to 1 which he reported to Utah. During the summer of 1959, Littlefield discussed the merger with W. H. H. Cranmer, now deceased, and Robert Cranmer. They in turn discussed the subject with Moran, McNeice and Morfeld who are not parties to the lawsuit and who are substantial stockholders and directors of Lucky Mc. On September 20, 1959, Littlefield and Mecia of Utah met in Salt Lake City with W. H. H. Cranmer, McNeice, Moran and Morfeld, who, together with Robert Cranmer were the major Lucky Mc minority stockholders and who were not stockholders in Utah. The Lucky Mc group proposed ratios of 7 to 1 and 8 to 1. The Utah group asserted that a 12 to 1 ratio was fair. Later in the meeting the negotiators agreed to settle on 10 to 1. This was presented to and approved by the directors of the two companies. The three Lucky Mc directors who were on the Utah board did not participate in the Lucky Mc vote of approval. Of the six remaining Lucky Mc directors, two were connected with Utah and four were not. Proxy statements were prepared and sent to the stockholders of each company. They were identical except for the covering letter.
 
 
 21
 The minority group says that the merger agreement and ratio were not reached as the result of arms-length bargaining. The argument is that the Lucky Mc group lacked the sophistication, experience, and knowledge of the Utah negotiators. We are not so persuaded. The testimony of the background of the Cranmers, Moran, and Morfeld in uranium, general mining, and corporate affairs is impressive. McNeice had a personal interest in the continuity of the company which had developed his discovery. The two Cranmers, Moran, Morfeld and McNeice are not complaining of the merger or the ratio even though they have a great deal more at stake than do the plaintiff and the intervenors. The Lucky Mc group succeded in lowering the ratio from 12 to 1 to 10 to 1. We are convinced that they acted in the interest of both themselves and the other Lucky Mc minority stockholders. The minority group makes much of the fact that the final negotiating session lasted but a short time. There is no mechanical legal requirement that a certain amount of time must be spent in such negotiations. Richland v. Crandall, S.D.N.Y., 262 F.Supp. 538, 546-547. The Lucky Mc group had an intimate familiarity with the essential facts. The record shows that they gave honest and undivided loyalty to the minority stockholders of Lucky Mc. The trial court correctly held that the merger agreement was reached by arms-length bargaining.
 
 
 22
 The trial court found that the 10 to 1 ratio was fair, equitable, and reasonable so far as the minority stockholders of Lucky Mc and the stockholders of Utah were concerned. The evidence is conflicting. The variation runs from the 3 to 1 ratio urged by the minority group expert Kesselman to the 12 to 1 ratio found by the Utah treasurer Dykstra. McNeice, Robert Cranmer, and Moran all testified that the 10 to 1 ratio was fair. The trial court said that the merger benefited the Lucky Mc stockholders by taking them out of a speculative uranium company with a one-product business and putting them in a substantial, broad-based, and diversified company. The crucial findings of the trial court are supported by the record and are binding on us. Stevens v. Vowell, 10 Cir., 343 F.2d 374, 377.
 
 
 23
 The minority group urges that the comparative earnings of Utah and Lucky Mc were either not disclosed or misstated in the proxy statement. The trial court resolved the controversy between the accounting experts in favor of Utah. The record contains hundreds of pages of testimony about theories of accounting, assumptions and counter-assumptions, market values, book values, comparative earnings, cash flow, dividend history, and future prospects. Only a few items need be mentioned.
 
 
 24
 Certain items of Utah income from sales of land and equipment are said to be extraordinary income which was not clearly identified in the proxy statement. Utah is a diversified company which engages in general construction work, mining, land acquisition, development and sale, and other activities. The Utah experts took the position that income from the sale of equipment and land was of a recurring, rather than extraordinary nature. We believe that the position is reasonable and that the finding of the court must be accepted.
 
 
 25
 Special reference is made to the Utah holding in the Marcona complex in Peru. Littlefield and Christensen had a small personal interest in this venture. The argument is that Utah needed the Lucky Mc cash flow to finance Marcona and that the failure to disclose the personal interests is deceptive. The answer is that no evidence was produced that Utah either needed or used, either before or after the merger, any funds derived from Lucky Mc for the Marcona venture.
 
 
 26
 The minority group complains that there was no independent appraisal of the properties of the two companies and that the omission of such an appraisal from the proxy statement makes it deceptive and misleading. We know of no legal requirement that the negotiators of a merger insist upon any certain type of appraisal or valuation. The question is whether in all the circumstances the negotiators exercised reasonably prudent judgment. Richland v. Crandall, S.D.N. Y., 262 F.Supp. 538, 547. We believe that they did.
 
 
 27
 Many pages of the record are devoted to the cash flow contributions of Lucky Mc to Utah and the claim is asserted that the proxy statement does not reveal the facts relating thereto. The argument is unpersuasive. The minority group's expert computed the cash flow from information contained in the proxy statement and admitted that the data so obtained was more favorable to Lucky Mc than the data which he characterized as more reliable. It is self-evident that when two companies merge the survivor has the cash flow of both.
 
 
 28
 The extreme of the minority group attack is that the proxy statement does not disclose the interlocking directorate. On page 2 of that statement reference is made to the fact that the Lucky Mc directors who are Utah directors abstained from voting on the merger and that of the remaining six directors of Lucky Mc one is an officer and stockholder of Utah and the other an employee and stockholder of Utah.
 
 
 29
 Without going into further detail, we believe that the "dividend history" is not stated in a misleading manner; that Utah's share of undistributed earnings of subsidiaries and affiliates and of Lucky Mc's contributions thereto was fairly revealed; that the statement of Utah's diversification is unobjectionable; and that the reasons and purposes of the merger were adequately disclosed.
 
 
 30
 In the final analysis this is a fact case and the minority group is seeking a trial de novo in the court of appeals. The trial court found no breach of any fiduciary duty. The trial court also found that the merger agreement and ratio were fair and that the proxy statement was not defective because of material nondisclosures, omissions, or misstatements. The pertinent transactions and material facts were disclosed in sufficient detail; and absent any breach of fiduciary duty, the disclosure of additional information was not required. In our opinion there is substantial record evidence to sustain all of the findings and they are not clearly erroneous. Accordingly, there can be no recovery by the minority group under either Rule 10(b)-5 or under any legal theories based on pendent jurisdiction.
 
 
 31
 In the circumstances, it is unnecessary to consider the questions of reliance or damages.
 
 
 32
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Rule 10(b)-5 reads:
 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange.
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 in connection with the purchase or sale of any security."