Jack KERBS, Plaintiff-Appellee,

v.

FALL RIVER INDUSTRIES, INC., a Colorado corporation, et al., Defendants-Appellants.

No. 73–1640.

United States Court of Appeals,
Tenth Circuit.

Argued March 20, 1974.

Decided Sept. 6, 1974.

Rehearing Denied Oct. 3, 1974.

Arthur W. Zarlengo, Denver, Colo., for defendants-appellants.

Leonard W. Burningham of Moffat, Welling, Paulsen & Burningham, Salt Lake City, Utah (Richard H. Moffat, Salt Lake City, Utah, on the brief), for plaintiff-appellee.

Before DURFEE,* Senior Judge, and HILL and McWILLIAMS, Circuit Judges.

DURFEE, Senior Judge.

This action arises under Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5 of the Se-curities and Exchange Commission, 17 C.F.R. § 240.10b–5. Plaintiff, Jack L. Kerbs, seeks to recover $6,200 lost in the course of dealings with defendants, whose conduct, it is alleged, operated a fraud or deceit upon him. Following a trial to the court, judgment was entered in plaintiff's favor against defendants Marlin H. Thompson, Fall River Industries, Inc. and Securities Transfer, Ltd.[1] Defendants appeal contending (a) that the evidence adduced at trial was insufficient to support the trial court's findings of fact, and (b) that such evidence, in any event, failed to establish any of the elements required to make out a case under Section 10 and Rule 10b–5.

The complaint included the following allegations: that one Dial and Thompson met with plaintiff on two occasions during the latter months of 1971 and early months of 1972, and that at said meetings they induced plaintiff to enter into an agreement whereby plaintiff would obtain a loan from the Utah State Employee's Credit Union in the amount of $10,000; that said funds were to be divided between Dial, who was to receive $6,200, and plaintiff, who was to retain the balance; that as security for said agreement Dial assigned, transferred and delivered to plaintiff a stock certificate, No. N887, for 25,000 shares of the capital stock of defendant Fall River Industries, Inc.

It was further alleged that during the course of the aforementioned meetings defendant Thompson represented himself to plaintiff as president of Fall River Industries; that at all times defendant Thompson acted in concert with Dial, and acted on behalf of himself and as an officer or agent of defendant Fall River Industries; that on two occasions during the course of these negotiations plaintiff telephoned defendant, Securities Transfer, Ltd. (the transfer agent for Fall River Industries), and inquired

---

* Honorable James R. Durfee, Senior Judge, United States Court of Claims, sitting by designation.

1. Glen Dial, who was named as a defendant in this action, was never served with a summons and a copy of the complaint, and was therefore not a party in the trial court proceedings.

as to the status of stock certificate No. N887 of said corporation, and that on both occasions plaintiff was informed that said stock certificate represented free-trading stock; that in reliance upon the representations of each of the defendants plaintiff entered into the agreement with Dial and accepted the Fall River Industries' stock certificate, which was represented by each and every defendant as being a valid and true stock certificate; that Securities Transfer, Ltd. subsequently notified plaintiff that said stock certificate was not a part of their records; that all of the foregoing acts of defendants constitute a scheme or artifice to defraud plaintiff; that all of the defendants engaged in acts which operated a fraud upon plaintiff; that said acts involved the use of an instrumentality of interstate commerce and the mails; and that as a result of the representations of Dial, Thompson and Fall River Industries, and of the refusal of Securities Transfer, Ltd. to transfer stock certificate No. N887, he was damaged in the amount of $6,200.

Defendants denied the alleged misconduct, but admitted that Securities Transfer refused to transfer certificate No. N887 because said certificate had been stolen and was not a part of the transfer agent's records.

Plaintiff and defendant Thompson were the only two witnesses to testify at trial.

Kerbs told of his course of dealings with defendants, and of three meetings at which Glen Dial and Marlin Thompson were present. He stated that a few days prior to the first meeting Dial and another person had approached him to discuss an arrangement whereby Kerbs would use certain Fall River Industries stock as collateral for a bank loan. Kerbs would keep part of the proceeds of the loan, in order to relieve himself of certain financial difficulty, and he would turn over the remainder of said proceeds to Dial. The first meeting at which Thompson was present was conducted in a motel room in January, 1972; the meeting had been arranged by telephone. It was during this first assembly at the motel room that Dial transferred Fall River stock certificate No. N887 to Kerbs. The certificate showed that Danny W. Cress was its owner; it was for 25,000 shares. There was a general discussion between Dial and Kerbs concerning the value of Fall River stock, and concerning the use of certificate No. N887 as security for the anticipated loan. Kerbs testified that he had no specific conversation with Thompson at this time, except for a greeting, but that Thompson was present during the discussion between himself and Dial. Kerbs stated that he was aware at this time of Thompson's position as president of Fall River Industries, in that Thompson's signature and office appeared on the face of the stock certificate transferred and delivered to him.

Kerbs further testified that, prior to finalizing his loan with the Utah State Employee's Credit Union, he had telephoned the American National Bank in Denver, Colorado, and had received verification of the signature of Danny W. Cress, which appeared on the stock power and assignment. An officer of that bank had guaranteed Cress' signature. Kerbs stated that he also had had a telephone conversation with a party in the office of defendant Securities Transfer in Florida to check the validity of stock certificate No. N887.

The amount of the loan actually obtained by Kerbs from the credit union was $9,800. Kerbs received a check for $6,200, and the balance of $3,600 was handled as an accounting transaction, representing the amount already owed by Kerbs to the credit union. Kerbs testified that four or five days after the first meeting with Dial and Thompson, and subsequent to his receipt of the loan payment, he returned to the same motel room and gave Dial a personal check for $6,200. Thompson had temporarily left the room to purchase a "pop," and had returned. Dial and Kerbs proceeded to the latter's bank where Dial endorsed

Kerbs' check and received a cashier's check from the bank in the amount of $6,200.

Kerbs also stated that when he next met with Dial and Thompson, Thompson delivered to him another stock certificate of Fall River Industries, certificate No. N888, as well as another stock power and assignment. It was Kerbs' understanding that this certificate was to be used for a loan arrangement similar to that involving certificate No. N887. Certificate No. N888 also showed its owner to be Danny W. Cress, and it was also for 25,000 shares. Kerbs stated that he had a discussion with Thompson at this point in time, lasting about fifteen minutes or so, concerning Fall River Industries.[2] Subsequently, on February 1, 1972, Kerbs returned to the motel room, where Dial, the only one present at the time, signed a document acknowledging receipt back of stock certificate No. N888. It was on this occasion that Dial and Kerbs executed their written agreement concerning stock certificate No. N887. That agreement provided that in consideration of the loan obtained by Kerbs, the proceeds of which were divided between Dial and Kerbs, Dial thereby assigned, transferred and delivered to Kerbs stock certificate No. N887; that it was understood that if Dial should fail to pay to Kerbs the sum of $6,200, together with interest, by May 1, 1972, that Kerbs would have the right to sell sufficient shares to pay for the $10,000 indebtedness; and further that Kerbs would retain, for his own benefit, 2,000 shares of said capital stock.

Thompson testified on behalf of defendants. He stated that he had become president of Fall River Industries in September, 1969, and that he was president at the time the transactions involved in this lawsuit were taking place. He testified that he sold his interest in Fall River Industries in January or February of 1972. Thompson described Dial as a friend and a business associate. He occasionally shared the same motel room with Dial, and met with him on almost every occasion when he was in Salt Lake City, Utah. Thompson testified that Dial had occasional access to the files of the company, that Dial was at one time vice-president of Fall River Industries, and that Dial did not own any shares of Fall River capital stock.

Thompson further testified that stock certificate No. N887 was a forged certificate, and that it was not an authorized and issued certificate of Fall River Industries; that he had no knowledge as to how Dial came into possession of the certificate, and that he believed it had been in the possession of Securities Transfer, Ltd.; that Danny W. Cress, whose name appeared on both stock certificates Nos. N887 and N888, was his stepson; that Danny W. Cress was not the owner of certificate No. N887 in the amount of 25,000 shares, but that the signature of Cress appearing on the stock power and assignment appeared to be valid.

Thompson denied any knowledge of dealings between Dial and Kerbs, and of the transactions between them. He stated that he was present in the motel room with Dial when a particular person was engaged in conversation with Dial, but that he had paid no attention to the person or to the discussion. Thompson also denied that he delivered stock certificate No. N888 to Kerbs, but stated that on one occasion he delivered a manila envelope, the contents of which were unknown to him, to an unknown person through the door of the motel room where Dial was staying.

It is undisputed that Securities Transfer refused to transfer the Fall River stock to plaintiff because certificate No. N887 was not a part of the transfer agent's records.

---

2. Kerbs testified about his conversation with Thompson, as follows: "He was telling me how good Fall River was and how it was a full-registered company, and a bunch of things that I didn't really know that much about. But he was giving me a pretty good run down on the company."

The trial court made findings of fact, based upon the evidence presented at trial, as follows: that defendant Marlin H. Thompson, at all times pertinent to the matters involved in this lawsuit, was an officer of defendant Fall River Industries; that during the latter part of January 1972, and the early part of February 1972, Thompson induced plaintiff to enter into and perform an agreement whereby plaintiff gave defendants $6,200 in exchange for a stock certificate representing 25,000 shares of Fall River Industries; that defendant Securities Transfer was the transfer agent for Fall River Industries, and was contacted by telephone by plaintiff prior to the aforementioned transaction, and that the transfer agent represented to plaintiff that certificate No. N887 was good, free-trading stock; that during the period when defendant Thompson was inducing plaintiff to purchase the stock in question, the meetings between plaintiff and Thompson were arranged by telephone; that certificate No. N887, and the assignment attached thereto, were sent to defendant Securities Transfer to be transferred to plaintiff, and that the transfer agent refused to transfer the same, claiming that the certificate was not a part of its records; and that the aforementioned stock certificate and assignment attached thereto were fraudulent and all of the defendants, at all pertinent times, knew so. The trial court concluded that all of the defendants, and each of them, engaged in acts which operated as a fraud or deceit upon plaintiff in connection with the purchase or sale of a security; that defendants used a means or instrumentality of interstate commerce to engage in these acts; and that plaintiff is entitled to judgment against defendants in the amount of $6,200, plus interest and costs.

██ We have carefully considered the entire record before us, and we have given serious attention to defendants'

claim that the evidence adduced at trial is insufficient to support the crucial findings of fact made by the trial court. It is our conclusion that there is ample evidence in the record to support the trial court's findings with respect to the participation of defendants Thompson and Fall River Industries in the fraud perpetrated upon plaintiff. Accordingly, we are bound by those findings on appeal. Stevens v. Vowell, 343 F.2d 374 (10th Cir. 1965); Springer v. Townsend, 336 F.2d 397 (10th Cir. 1964). We reach a different conclusion, however, with respect to the sufficiency of the evidence to support the trial court's findings as to the involvement of defendant Securities Transfer in the fraudulent scheme. The only evidence on the matter is the testimony of Kerbs that he telephoned Securities Transfer in Florida and that he was informed by an employee of that company that certificate No. N887 was good, free-trading stock.[3] Standing alone, this evidence is insufficient to support the conclusion that Securities Transfer was a participant in the fraudulent scheme herein involved, and the record is devoid of any other evidence which would indicate complicity on the part of the transfer agent. Plaintiff's counsel admitted, upon questioning at oral argument, that there was really nothing in the record before us to link the transfer company to the course of dealings between plaintiff and Dial, Thompson and Fall River Industries. The trial court's finding that Securities Transfer engaged in acts which operated as a fraud or deceit upon plaintiff, in connection with the purchase or sale of a security, is clearly in error.

██ Defendants next assert that the evidence adduced at trial failed to establish the elements required to make out a case under § 10(b) of the Securities Exchange Act of 1934[4] and Rule

3. The fact of the conversation with Securities Transfer was admitted by the trial judge only for the purpose of showing Kerbs' state of mind and not to show the truth of the matters discussed.

4. The pertinent portion of the Act is codified at 15 U.S.C. § 78j (1970), and reads as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any

10b–5.[5] It is now well established that a violation of the provisions of § 10(b) gives rise to a private cause of action. *See* Superintendent of Insurance of New York v. Bankers Life & Casualty Co., 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169, 30 L.Ed.2d 128, 134 (1971); Crist v. United Underwriters, Ltd., 343 F.2d 902, 903 (10th Cir. 1965); 6 L. Loss, Securities Regulation 3869–3873 (1969). Jurisdiction will be established, and a case will be made out under the statute and the rule, if plaintiff is successful in proving (1) the use of the mails or instrumentalities of interstate commerce; (2) the purchase or sale of a security; and (3) the use of a manipulative or deceptive device. Stevens v. Vowell, *supra*, 343 F.2d at 378; Boone v. Baugh, 308 F.2d 711, 713 (8th Cir. 1962). The issues relative to the establishment of these required elements of plaintiff's cause are considered in turn.

The first argument advanced by defendants is, in effect, that the court lacked jurisdiction over the subject matter of this action. To meet the jurisdictional requirements of § 10 of the Act and Rule 10b––5 the manipulative or deceptive device or contrivance must be shown to have been accomplished by the use of some means or instrumentality of interstate commerce or of the mails, or of some facility of any national securities exchange. It is not required by the statute or the rule that the manipulative or deceptive device or contrivance be a part of or actually transmitted in the mails or instrumentality of interstate commerce; it is sufficient that such a device or contrivance be employed *in connection with* the use of the instruments of interstate commerce or the mails. Stevens v. Vowell, *supra*, 343 F.2d at 378–379; Ellis v. Carter, 291 F.2d 270, 274 (9th Cir. 1961); Boone v. Baugh, *supra*, 308 F.2d at 714. We have seen from the evidence adduced at trial that at least one of the meetings between Kerbs and Thompson—at which the scheme to defraud plaintiff was carried out—was arranged during the course of a telephone conversation between Kerbs and Dial. Defendants would have us hold that the required nexus between the manipulative device or contrivance and the use of an instrumentality of interstate commerce has not been established, because neither Thompson nor Fall River Industries were themselves party to these telephone communications. Defendants' argument is unconvincing. It is evident that throughout the course of their dealings with plaintiff, and in the implementation of their scheme to defraud him, Dial and Thompson acted for and on behalf of each other, with a common purpose, and with a common goal; each played his respective role in the overall plan to induce plaintiff to enter into the transaction herein involved. The fact is that a meeting at which defendants acted in violation of § 10 and Rule 10b––5

means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

5. Rule 10b–5, 17 C.F.R. § 240.10b–5 (1973), reads as follows:
"It shall be unlawful for any person, directly or indirectly, by the use of any

means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange—
(a) To employ any device, scheme, or artifice to defraud,

\* \* \* \* \*

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security."

was arranged by the telephonic communications of one acting in concert and in conspiracy with them, and in furtherance of their common unlawful scheme. The establishment of these facts, we believe, is clearly enough to satisfy the jurisdictional requirements of the statute and the rule that the proscribed deceptive device or contrivance used by defendants be employed in connection with the use of an instrumentality of interstate commerce; and we so hold. Nor can we dispose of this issue in defendants' favor merely because the telephone messages used to arrange such meeting between plaintiff and Thompson involved *intra*state communications. Both intrastate and interstate telephone communications are part of an aggregate telephonic system as a whole. *Cf.* Lipinski v. United States, 251 F.2d 53, 56 (10th Cir. 1958). And as long as the instrumentality itself is an integral part of an interstate system, Congress has power, when necessary for the protection of interstate commerce, to include intrastate activities within its regulatory control. See Weiss v. United States, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298 (1939); N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1936). Accordingly, we hold that proof of intrastate telephonic messages in connection with the employment of deceptive devices or contrivances is sufficient to confer jurisdiction in a § 10(b) and Rule 10b—5 action. Myzel v. Fields, 386 F.2d 718, 727 (8th Cir. 1967); Ingraffia v. Belle Meade Hospital, Inc., 319 F.Supp. 537, 538 (E.D.La. 1970); Childs v. RIC Group, 331 F. Supp. 1078, 1082 (N.D.Ga.1970), aff'd, 447 F.2d 1407 (5th Cir. 1971); Lennerth v. Mendenhall, 234 F.Supp. 59, 63 (N.D.Ohio 1964); Nemitz v. Cunny, 221 F.Supp. 571, 575 (N.D.Ill.1963).

■ Defendants next assert that the evidence in this case does not establish a "purchase or sale" of a "security" within the ambit of § 10(b) of the Act and Rule 10b—5. A "security" is defined in the act, at 15 U.S.C. § 78c(a)(10), as

" * * * any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement * * * preorganization certificate or subscription, transferable share, investment contract * * * for a security, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing * * *."

As used in the Act, the term "security" "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." S. E. C. v. W. J. Howey Co., 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244, 1250 (1946); *accord,* Tcherepnin v. Knight, 389 U.S. 332, 338, 88 S.Ct. 548, 554, 19 L.Ed.2d 564, 570 (1967). Whether a particular transaction involves a security depends upon the facts and circumstances of the case. *See e. g.,* S. E. C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943). Vincent v. Moench, 473 F.2d 430 (10th Cir. 1973). Substance is exalted over form and emphasis should be placed upon economic reality. Vincent v. Moench, *supra* at 435; Continental Marketing Corp. v. Securities & Exchange Com'n, 387 F.2d 466, 470 (10th Cir. 1967). We have no difficulty in fitting the forged certificate that was transferred and delivered to plaintiff into the statutory definition of "security."

■ The statute defines the term "purchase" to include "any contract to buy, purchase, or otherwise acquire", 15 U.S.C. § 78c(a)(13), and the term "sale" to include "any contract to sell or otherwise dispose of", 15 U.S.C. § 78c(a)(14). As recognized by the Court of Appeals in Dasho v. Susquehanna Corp., 380 F.2d 262, 266 (7th Cir. 1967), cert. denied sub nom Bard v. Dasho, 389

U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967), this broad language included in the statutory definitions

"* * * indicates an intention by Congress that the words 'purchase' and 'sale' are not limited to transactions ordinarily governed by the commercial law of sales. The purpose is evidently to make control of securities transactions reasonably complete and effective to accomplish the purpose of the legislation."

*See also,* Knauff v. Utah Construction & Mining Co., 408 F.2d 958, 961 (10th Cir. 1969); Vine v. Beneficial Finance Company, 374 F.2d 627, 634 (2d Cir. 1967), cert. denied 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967). In the instant case, stock certificate No. N887 for 25,000 shares of Fall River stock was assigned, transferred and delivered to plaintiff to be used as collateral for a loan. The agreement between plaintiff and Dial provided that sufficient shares of the transferred stock could be sold by plaintiff to cover Dial's indebtedness to him, in the event that Dial failed to pay back the $6,200 owed. Moreover, the contract provided for the retention by plaintiff of 2,000 shares of Fall River stock in consideration of the loan obtained by him. We are compelled to the conclusion that the transaction herein involved is a "purchase" and "sale" of a security, falling squarely within the statutory definition of those terms.

■ Defendants' final argument is that there was no evidence presented at trial to implicate them in an unlawful scheme or device to defraud Kerbs. Violation of § 10(b) of the Act is predicated upon the use of a manipulative or deceptive device or contrivance in contravention of the rules and regulations that the Securities and Exchange Commission might prescribe. Rule 10b—5 provides that it shall be unlawful (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person. The securities laws should be construed not technically and restrictively, but flexibly in order to effectuate their remedial purpose. As stated by the Court in A. T. Brod & Co. v. Perlow, 375 F.2d 393, 397 (2d Cir. 1967):

"We believe that § 10(b) and Rule 10b—5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws."

*Accord,* Richardson v. MacArthur, 451 F.2d 35, 40 (10th Cir. 1971).[6]

■ Essentially, defendants' position is that Thompson's mere presence at the meetings between plaintiff and Dial is less than active participation in Dial's fraudulent scheme, and as such defendants are not liable under Rule 10b—5. It is contended that the mere silence or inaction of Thompson is insuf-

---

6. It will also be observed that, while the Courts of Appeals are divided on the question of the necessity of proving scienter to establish liability under Rule 10b–5, the pronouncements of this circuit on the matter have been clear and consistent. As stated by Judge Hill in Stevens v. Vowell, *supra,* 343 F.2d at 379:

"* * * It is not necessary to allege or prove common law fraud to make out a case under the statute and rule. It is only necessary to prove one of the prohibited actions such as the material misstatement of fact or the omission to state a material fact." Citing Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (9th Cir. 1962); Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961); and Matheson v. Armbrust, 284 F.2d 670 (9th Cir. 1960), cert. denied, 365 U.S. 870, 81 S.Ct. 904, 5 L.Ed.2d 860 (1961).

*Accord,* Mitchell v. Texas Gulf Sulphur Company, 446 F.2d 90, 97 (10th Cir. 1971); Allen v. H. K. Porter Co., 452 F.2d 675, 678 (10th Cir. 1971).

ficient to establish defendants' participatory involvement in inducing plaintiff into transactions with Dial, when a contrary inference of non-participation and non-inducement is, according to defendants, equally compelling. The problem with defendants' argument is that it confines the issue presented to a simplified and inappropriate analytical framework, and it ignores applicable principles of securities law which have heretofore been formulated. Under § 10(b) and Rule 10b—5 knowing assistance of or participation in a fraudulent scheme gives rise to liability equal to that of the perpetrators themselves. Strong v. France, 474 F.2d 747, 752 (9th Cir. 1973); Anderson v. Francis I. DuPont & Co., 291 F.Supp. 705, 709 (D.Minn. 1968); Brennan v. Midwestern, etc., Life Ins. Co., 259 F.Supp. 673, 682 (N. D.Ind. 1966); Pettit v. American Stock Exchange, 217 F.Supp. 21, 28 (S.D.N.Y. 1963). Moreover, one who aids and abets a fraudulent scheme may be held accountable even though his assistance consists of mere silence or inaction. *Strong, supra,* 474 F.2d at 752; *Anderson, supra,* 291 F.Supp. at 709; *Brennan, supra,* 259 F.Supp. at 682. We must conclude, on the basis of the record before us, that the activities of Thompson and Fall River Industries constituted knowing assistance and participation in a fraudulent scheme, in contravention of 10(b) of the statute and Rule 10b—5.

The evidence upon which the trial court based its findings of fact and conclusions of law shows that Thompson was present at meetings during which the fraudulent transaction between Dial and plaintiff was arranged and discussed; that plaintiff was made aware, during the first motel room meeting, that Thompson was president of Fall River Industries, and that plaintiff at that time accepted transfer and delivery of 25,000 shares of Fall River stock; that Thompson knew Dial owned no stock in Fall River Industries, and further knew that his stepson, Danny Cress, did not own certificate No. N887

in the amount of 25,000 shares. As a corporate "insider" possessed of material information pertinent to the legitimacy of the Dial-Kerbs securities transaction, Thompson was obliged to speak out. The duty of disclosing material facts is one imposed upon "insiders" by § 10 and Rule 10b—5. Thompson not only breached that duty, but allowed his presence and acquiescence to lend the appearance of legitimacy to an otherwise fraudulent deal. That is enough to support liability under the statute and the rule. There is, moreover, additional evidence of Thompson's participation in the scheme to defraud plaintiff. Kerbs testified that Thompson delivered stock certificate No. N888 to him at another meeting in Dial's motel room, and that Thompson at that time gave him "a pretty good rundown" on Fall River Industries. The trial court permitted Kerbs to testify as to this transaction involving certificate No. N888, also in Danny Cress' name and for 25,000 shares, over defendants' objection as to its relevance. It was Kerbs' understanding that that certificate was to be used for a loan arrangement, similar to that involving certificate No. N887. Kerbs' testimony as to this meeting and discussion with Thompson was clearly relevant as evidence of an overall scheme to defraud plaintiff, and the trial court did not abuse its discretion in allowing its admission. The totality of facts and circumstances herein indicates, as the trial court found, that Thompson was a knowing participant in the fraudulent scheme against Kerbs; such participation constitutes conduct proscribed by § 10 and Rule 10b—5, and as such, is sufficient to establish liability under the statute and the rule.

 Finally, defendant Fall River Industries argues that even if Thompson, its president, is liable for fraud and deceit, there is no basis on which to impute that fraud and deceit to the corporation, because plaintiff made no showing that Thompson was acting within the scope of his corporate authority or employment. The general rule that a

principal is liable for the fraud and misrepresentations of his agent while acting within the scope of his authority or employment is fully applicable to corporations, even though the corporation did not authorize the fraud, or could not even be deemed to know of the fraud. *See* 37 Am.Jur.2d Fraud and Deceit § 321; 19 C.J.S. Corporations § 1278. The Restatement of Agency, Second (1958), at § 261, states the applicable principle as follows:

> "A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud."

And § 262 of the Restatement provides:

> "A person who otherwise would be liable to another for the misrepresentation of one apparently acting for him is not relieved from liability by the fact that the servant or other agent acts entirely for his own purposes, unless the other has notice of this."

We have found no Utah caselaw directly in point, but we are convinced that the Utah courts would not differ from these articulated principles of agency law.

■ Fall River Industries made Thompson its principal officer, placing him in a position to speak for and on behalf of the corporation. Plaintiff was aware of Thompson's presidency of Fall River Industries, having been introduced to him, and having seen his name on stock certificate No. N887 in the space provided for the signature of the corporation's president. Thompson testified that he had spoken to many persons about Fall River Industries, and he stated "I was trying to sell a company." Fall River Industries clearly permitted Thompson, in the course of his dealings with plaintiff and with others, to hold himself out as a spokesman for the corporation and as a promoter of its business interests. We hold that Fall River Industries is liable to plaintiff because

Thompson, its president, acting within the scope of his apparent authority as principal officer and agent of the corporation, engaged in conduct which violated the provisions of § 10 of the Act and Rule 10b—5. *See* Securities and Exchange Commission v. First Securities Company of Chicago, 463 F.2d 981 (7th Cir. 1972), cert. denied sub nom. McKy v. Hochfelder, 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972).

For the foregoing reasons, the judgment entered against defendants Thompson and Fall River Industries, Inc. will be affirmed; the judgment entered against defendant Securities Transfer, Ltd. will be reversed.