Grant A. HICKMAN et al.,
Plaintiffs,

v.

Arthur J. GROESBECK, III, et al.,
Defendants.

No. C 252–72.

United States District Court,
D. Utah,
Central Division.

Dec. 18, 1974.

Adam M. Duncan, Salt Lake City, Utah, for plaintiffs.

William R. Dickerson of Lafollette, Johnson, Horgan & Robinson, Los Angeles, Cal., and Reed L. Martineau of Worsley, Snow & Christensen, Salt Lake

City, Utah, for defendant Carlin, Levy & Company.

Robert M. Anderson, Salt Lake City, Utah, and Jean L. Weaver of Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, for defendant Commercial Security Bank.

Kenneth W. Yeates of Prince, Yeates, Ward, Miller & Geldzahler, Salt Lake City, Utah, for all other defendants.

ALDON J. ANDERSON, District Judge.

The plaintiffs at Salt Lake City, Utah, purchased certain interests in a limited partnership known as Cinco Villa Company, which they allege are securities within the meaning of 15 U.S.C. § 78c(a)(1), and contend that the sale of these interests by certain of the named defendants violated Section 10 of the Securities Exchange Act of 1934 and Rule 10b–5, promulgated thereunder. Plaintiffs further allege that defendants Carlin, Levy and Company, Certified Public Accountants, and Commercial Security Bank, were aiders and abetters in the alleged securities fraud, and that certain of the defendant Groesbeck corporations are liable as alter egos of defendant Groesbeck, or as control persons under Section 20 of the Exchange Act of 1933. Plaintiffs also claim damages under common law fraud principles and exemplary damages against certain of the named defendants. Jurisdiction exists under the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and the pendent jurisdiction of this court.

The matter came before the court, sitting without a jury, for hearing commencing on August 26, 1974. The parties appeared in person and were represented by their respective counsel. Plaintiffs presented their case by documentary evidence and sworn testimony. At the close of the plaintiffs' case, defendant Commercial Security Bank moved to dismiss the action as against it pursuant to Fed.R.Civ.P. 41 (b). The court granted the bank's motion and it was dismissed from the case.[1] A similar motion was made by defendant Carlin, Levy and Company, and this motion was taken under advisement. The cause was submitted to the court for its determination and decision as to the other defendants. This opinion, together with the admitted facts contained in the pretrial order, shall constitute this court's Findings of Fact and Conclusions of Law, as required by Fed.R.Civ. P. 52(a).

## FACTS AND BACKGROUND

During 1968 and prior thereto, defendant Arthur J. Groesbeck, III, was employed by Financial Concept, Inc., at Los Angeles, California, as an advisor to professional people in the areas of financial planning and investments. His activities involved generally the organization of limited partnerships in real estate and the sale of interests in those limited partnerships to professional people as an investment and tax shelter. In order to engage in this same type of business activity on his own, Groesbeck organized and/or acquired an interest in a number of business entities in 1968 and 1969.[2]

Jordan M. Carlin and Harvey H. Levy are licensed and practicing Certified Public Accountants and are partners in the Los Angeles accounting firm of Carlin, Levy and Company, one of the defendants herein (hereinafter Carlin-Levy). Commencing in 1967, Carlin-Levy prepared the personal tax returns for Groesbeck, and following the organization or acquisition by Groesbeck of the other business entities referred to above, Carlin-Levy also prepared tax returns

---

1. Findings of Fact and Conclusions of Law were filed by the court respecting Commercial Security Bank's dismissal from the case on October 10, 1974.

2. These business entities which are named defendants in this case include Arthur J. Groesbeck Associates, Inc., Griffin Service Corporation, Griffin Properties Corporation, Griffin Securities Corporation, Griffin Business Services Corporation, Compumanagement Company, A. J. Groesbeck Financial Advisors, Inc., and A. J. Groesbeck Associates of Utah, Inc.

and did other general accounting work for those entities.

Sometime prior to November 11, 1969, Groesbeck, or the Groesbeck organization, conceived of a limited partnership to be known as "Cinco Villa." On November 11, 1969, Harvey H. Levy received a phone call from an agent or employee of Groesbeck, in which he was requested to render a tax impact opinion letter regarding the deductibility of prepaid interest and losses of the proposed Cinco Villa. It was requested that the opinion letter be prepared on the basis of facts which were related to Levy over the telephone. Based upon the information and assumptions related to him,[3] Levy prepared a tax impact opinion letter, as requested, dated November 13, 1969.[4] The format of this letter was the same as similar letters prepared for the Groesbeck organization for similar ventures, and, although addressed to Groesbeck, the letter was subsequently used by the Groesbeck organization in the marketing and sales of the limited partnership interests. The possibility that the letter would be used in the marketing of limited partnership interests through salesmen was known by Carlin-Levy.

To sell the limited partnership interests in Cinco Villa, the Groesbeck organization's marketing program consisted of postcards, seminars, and personal visits to prospective buyers. Defendant Peter Reid was employed as Director of Marketing by the Groesbeck organization during the fall of 1969 and was the organization's primary contact with each of the plaintiffs in the case.[5] Reid conducted seminars and discussions in December, 1969, and in connection therewith printed informational materials were distributed to prospective investors in person and through the mails. Plaintiffs Warr, Hickman, and Poulson each attended one or more of these seminars and each received the written informational materials. Plaintiffs Hickman, Poulson, and Warr received two sales brochures, one dated November 11, 1969, (Trial Exh. P–2) and one dated December 12, 1969, (Trial Exh. P–3). These plaintiffs also received the tax impact opinion letter under the letterhead of Carlin-Levy dated November 13, 1969, (Trial Exh. P–4). Plaintiff Fishler did not attend the seminars or receive any written material prior to signing the partnership agreement on December 29, 1969. Fishler did, however, have tele-

3. In the preparation of the tax impact opinion letter, Levy did not make independent verification of the information given to him by the Groesbeck organization, nor did he inspect the properties which were proposed to be purchased for the venture. On November 11, 1969, Cinco Villa was merely proposed and it came into existence later.

4. This letter was plaintiff's Exhibit 4 at trial.

5. Each of the plaintiffs is, and at all times material to this action was, a resident and citizen of the State of Utah. Plaintiffs Hickman and Poulson are licensed physicians. Plaintiff Warr is a licensed dentist. Plaintiff Fishler has been engaged in the pharmaceutical and medical supply business. Each of the plaintiffs is well educated and has had some investment experience. It is unnecessary for the court to outline in detail the exact steps which lead up to the investment decision of each plaintiff. Suffice it to say, defendant Peter Reid made three visits to Salt Lake City on December 2, December 16, and approximately December 29, 1969.

During such visits Reid met with Warr, Poulson and Hickman and on the last visit with Fishler. Groesbeck made one trip to Utah in October, 1969, and conducted a seminar. In connection with the seminars and the discussions, printed informational materials were distributed to the prospective investors in person and through the mails. Defendants Groesbeck and Reid also talked by telephone during that period with prospective Utah investors.

Plaintiffs Hickman, Warr and Poulson also submitted financial information to A. J. Groesbeck Associates, Inc., for the purpose of obtaining a financial analysis, including the recommendation of suitable investment programs. Plaintiff Fishler did not have any such financial analysis performed. There was no evidence at trial in any way indicating that such financial evaluations were in any way conducted for any purpose other than to make proper and suitable financial and investment recommendations to clients of A. J. Groesbeck Associates, Inc., or that the recommendations were in any way misleading or used for any ulterior purpose.

phone and personal discussions with Reid on December 29, 1969, in regard to the Cinco Villa venture.[6] The two sales brochures, the tax impact opinion letter, the partnership agreement, and correspondence prepared and distributed by the Groesbeck organization were reviewed by plaintiffs Warr, Poulson and Hickman with their respective accountant (Mr. Osman for Warr and Poulson) and tax attorney (Mr. Jardine for Hickman) prior to making the investment.

## CINCO VILLA

The Cinco Villa limited partnership was formed for the purpose of purchasing two apartment complexes located at 11130–32–34 Freeman Avenue and 4846–48 116th Street in Hawthorne, California. These two apartment house complexes are approximately a mile to a mile and a quarter apart from each other and consist of five four-unit buildings with three located at one location and two at the other.[7] On December 29, 1969, all of the plaintiffs herein executed copies of a limited partnership agreement and invested the following amounts:

| | |
|---|---|
| Grant A. Hickman | $40,000 |
| Stanford E. Poulson | 10,000 |
| Newell E. Warr | 5,000 |
| Ben M. Fishler | 15,000 |

On December 31, 1969, the Cinco Villa limited partnership was formed and on that day purchased the Cinco Villa apartment house complexes and paid the sum of $280,000, including broker's commission. Based upon an appraisal in which the market value could be reasonably estimated near the time of the sale, the fair market value of the Cinco Villa complexes closely approximated $280,000. The general partner for the Cinco Villa limited partnership was A. J. Groesbeck Associates of Utah, Inc., organized in December, 1969, but prior to the formation of the limited partnership.[8]

## ELEMENTS OF 10b–5

The private right of action under Rule 10b–5 is predicated on a statutory tort theory—a general principle of tort law that violation of a provision of a criminal statute designed to prevent a particular type of harm can give rise to a civil remedy. Mitchell v. Texas Gulf Sulphur Company, 446 F.2d 90, 97 (10th Cir. 1971). To recover under the rule it has been repeatedly held that a successful plaintiff must prove (1) the use of the mails or instrumentalities of interstate commerce, (2) the purchase or sale of a security; and (3) the use of a manipulative or deceptive device. Kerbs v. Fall River Industries, Inc., 502 F.2d 731, 737 (10th Cir. 1974); Stevens v. Vowell, 343 F.2d 374, 378 (10th Cir. 1965). The literal fulfillment of these three elements

---

6. Except for the partnership agreement signed December 29, 1969, Fishler neither saw nor received any other documents or written information on the Cinco Villa venture until the spring of 1970, after he had made his investment.

7. Reid originally viewed and examined the property sometime in November, 1969. Robert Tromblay, an employee of A. J. Groesbeck Associates, Inc., had managed and supervised the property while employed previously by Hawthorne Savings and Loan Company.

8. Subsequent to the formation of the limited partnership, plaintiffs received a picture of one of the apartment complexes and periodic letters under the letterhead of A. J. Groesbeck Financial Advisors for A. J. Groesbeck Associates, Inc. Such letters were signed A. J. Groesbeck, general partner, or A. J. Groesbeck Associates, Inc., of Utah, general partner.

Plaintiffs also received periodic reports from Compumanagement Company indicating the cash position and financial condition of the Cinco Villa limited partnership. For the years 1969, 1970, 1971 and 1972, plaintiffs received partnership income tax returns. Each of the plaintiffs deducted the specified amount of partnership loss attributable to each plaintiff on his own personal income tax returns for each of the indicated years. Defendant's Exhibit D–G–40 at trial indicated that over the four-year period, 1969–1972, each of the plaintiffs received the following total tax savings from his claimed deductions arising from his limited partnership interests in Cinco Villa:

| | |
|---|---|
| Grant A. Hickman | $21,636.93 |
| Stanford E. Poulson | 2,272.99 |
| Newell E. Warr | 1,422.32 |
| Ben M. Fishler | 6,134.12 |

does not, however, guarantee recovery. Although it is not necessary to allege or prove common law fraud to make out a case under Rule 10b–5, the "common law fraud elements—misrepresentation or nondisclosure, materiality, scienter, intent to defraud, reliance and causation —have crept in and played varying roles of significance." Mitchell v. Texas Gulf Sulphur Company, 446 F.2d, at 97. It is undoubtedly true that

> "[s]ome form of reliance-causation test for damages must remain in the rule . . . in order to prevent the rule from turning defendants into public guarantors of losses wherever a violation of the rule has occurred."[9]

In this Circuit it is clear that materiality,[10] scienter,[11] reliance and causation[12] and damages in connection with a mis-

representation or omission must be shown.

## THE MATERIALITY OF THE ALLEGED MISREPRESENTATIONS

At trial, plaintiffs claimed misrepresentations or omissions of fact arising from the two sales brochures, dated November 11, 1969, (Exh. P–2) and December 12, 1969, (Exh. P–3), prepared for and used in the sale of the limited partnership, from the tax impact opinion letter (Exh. P–4) prepared by Carlin-Levy, and from the sales seminars and personal discussions held in Salt Lake City by Groesbeck and Reid. Plaintiffs compiled in their post-trial brief a long list of alleged misrepresentations and omissions;[13] however, only

9. Cobine, Elements of Liability and Actual Damages in Rule 10b–5 Actions, 1972 Law Forum, 651, 684 (1972).

10. *See* Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90, 97 (10th Cir. 1971).

11. See Clegg v. Conk, 507 F.2d 1351 (10th Cir. 1974) in which the court, after reviewing the relevant Tenth Circuit decisions in the area, stated:
 "From their common principles and applications may be deduced the propositions that there is required something additional by way of scienter or conscious fault than mere negligence, and something more by way of reliance or causation in fact than some abstract wrong expending its force entirely upon itself."

12. *Id.*

13. The court finds that the following alleged misrepresentations or omissions are not material for the following reasons:
 1. In the November 11 and December 12, 1969, sales brochures the representations (a) that employees of A. J. Groesbeck Associates of Utah, Inc., were investing in the property as limited partners, and (b) that Carlin-Levy had been retained as auditors and tax counsel of the venture were not material because reasonable investors would not likely make an investment decision merely on the basis of what employees or functionaries of a corporation do or fail to do, nor would reasonable investors mistakenly assume that the success of an investment is dependent on who serves as auditors or tax counsel.
 2. In the November 11 and December 12, 1969, sales brochures the alleged omis-

sions to state (a) that Groesbeck owed 90% of both Griffin Properties Corporation and A. J. Groesbeck Associates, Inc., (b) that the "Table of Benefits" did not state that all of the numbers would change if any of the claimed deductible items were thereafter disallowed by the IRS, (c) that Groesbeck had never seen Cinco Villa, (d) that each limited partner would be subject to further cash calls should the limited partnership require additional funds, (e) that the amount of payments, whether inclusive or noninclusive of interest accrued, and whether payments were to be monthly, quarterly, annual or otherwise, on the first trust deed of $225,000, (f) that the identity of the owner of the second trust deed of $20,000 and consideration therefor was unknown, (g) that there were risks of short-time foreclosures upon late payment or other default, and that there might be possible problems of obtaining refinancing or additional financing where the property was subject to two trust deeds, and (h) that there was a prior and continuing relationship between Carlin-Levy and the Groesbeck organization, were not material because (a) common ownership of related corporations is no indication of foul play, (b) it is only common sense that claimed deductible items will change if disallowed by the IRS (however, the evidence shows that all the claimed deductible items were allowed by the IRS in this case), (c) the law does not require that a corporate president personally inspect every detail concerned with his corporation (in this case, Groesbeck's agent and employee inspected the property in question), (d) the

two were stressed at trial and only two could reasonably be argued to be material.

 First, in both the November 11, 1969, sales brochure and the tax impact opinion letter it is represented that Groesbeck would invest personally and be the general partner of Cinco Villa limited partnership when, in reality, A. J. Groesbeck Association of Utah, Inc., subsequently became the general partner. Although this representation was corrected in the December 12, 1969, sales brochure and in voluminous correspondence subsequent to plaintiffs' investment, this court finds that this representation could have been material to plaintiffs in making their investment decision. That is, as objectively measured against reasonable investors,[14] the plaintiffs' investment judgment was likely influenced by the representation that Groesbeck, a man represented to plaintiffs as being an experienced and successful financial adviser to large numbers of professional people, was personally investing funds in Cinco Villa as the general partner.[15] Second, the tax impact opinion letter used by the Groesbeck organization's sales promotion represented that the property consisted of "a 20-unit apartment building" rather than representing the property as located in two different locations.[16] The court is unable to say that this misrepresentation was material. Reasonable investors, without the hindsight that

subject of further cash calls need not be discussed in promotional material (this was clearly treated in paragraph 13 of the Limited Partnership Agreement, Exh. P–8), (e) this is not material that needs to be specified in promotional or sales material, (f) this is not material that needs to be specified in promotional or sales material, (g) contingent risks (which the evidence fails to show ever occurred) need not be mentioned in promotional or sales material, (h) a relationship between a corporation and its accountants is of little probative value in evaluating an investment possibility, especially in the absence of any evidence of illegal participation.

In the November 13, 1969, Tax Impact Opinion Letter prepared by Carlin-Levy the following are claimed omissions: (a) that the letter was based solely on two telephone conversations and a memo from the Groesbeck organizations, (b) that Carlin-Levy had made no investigation as to the property involved in the letter, (c) that Carlin-Levy had written at least six other similar letters, (d) that Carlin-Levy did not consider themselves qualified tax advisors or tax experts, (e) that Carlin-Levy had never written a tax impact letter for anyone other than the Groesbeck organization, and (f) that Carlin-Levy had performed internal accounting services for all of the Groesbeck corporations. The court finds that these alleged omissions were not material because it is not customary in the accounting profession, when preparing a tax impact letter, to include this type of information because the tax opinion letter was prepared only for a "proposed" limited partnership venture. It was a representation of the tax consequences of prepaid interest and losses and not a warranty on the location or condition of the property. The information in the letter was shown by the evidence to be accurate and the deductions represented were allowed by the IRS.

Plaintiffs have failed to establish by a preponderance of the evidence that the alleged misrepresentations or omissions in this footnote would be material to the investment decision of a man of ordinary prudence and intelligence under the circumstances in this case.

14. SEC v. Texas Gulf Sulphur Co., 446 F.2d 90, 97 (10th Cir. 1971).

15. The court does not reach this conclusion without considerable hesitation, especially in light of plaintiffs' subsequent inaction upon discovering for certain that Groesbeck was not the general partner.

It seems that if the representation that Groesbeck was going to personally invest in Cinco Villa as general partner was of primary significance in the plaintiffs' investment decision, (as they testified it was) it is almost inconceivable that they did not protest upon their discovery of the truth, which at the latest would have been April, 1970, when each of the plaintiffs received from Cinco Villa the necessary information to file his 1969 income tax return. However, the court does not feel that this fact alone justifies a conclusion that this representation was not material at the time the investment decision was made in December, 1969.

16. Despite the language "a 20-unit apartment building" the tax impact letter listed both addresses of the two separate complexes.

plaintiffs now have that two separate locations might cause additional management and supervisorial problems, would not likely be influenced in their investment decision by the fact that the twenty apartment units were at two different, although proximate, locations.

## SCIENTER

■ Scienter or "conscious fault" [17] is easily found in this case. Groesbeck indisputably distributed sales material and reports on the Cinco Villa venture representing himself as becoming the general partner when the limited partnership was organized. Before the execution of the partnership agreement, as well as after the investments were made, Groesbeck corresponded with plaintiffs, signing his name as Cinco Villa's general partner. Without doubt Groesbeck knew that he was misrepresenting this fact.

## RELIANCE AND CAUSATION [18]

■ The Circuit Court of Appeals has repeatedly expressed the requirement that "the plaintiff must . . . exercise good faith in its purchase, due diligence, and demonstrate reliance on the acts or inaction of the defendant" [19] to recover in Rule 10b–5 actions. Reliance and causation are very closely related in some cases. In Mitchell v. Texas Gulf Sulphur Co., 446 F.2d, at 101–102, the court stated that "the cases have deemed the 'connection' requirement fulfilled" if the defendant has uttered false or misleading statements concerning the securities in question, upon which the plaintiff has relied. This use of the concept of reliance as a means of finding a connection introduces the factor of causation. Thus, a plaintiff could rely on a material misrepresentation or omission which would cause him to purchase or sell a security. If the misrepresentation concerned the value of the security, then the damage could be said to occur when the purchase or sale was made. In this example, materiality, reliance and causation would be closely related sequentially. The materiality and reliance could be said to

---

17. *See* Footnote, 11, *supra.*

18. Undoubtedly the area of federal securities litigation is better off for not analyzing cases in terms of proximate cause. However, with the White v. Abrams, 495 F.2d 724 (9th Cir. 1974) duty analysis in the Ninth Circuit and the brief discussion of "cause in fact" in the recent Tenth Circuit decision of Clegg v. Conk, 507 F.2d 1351 (10th Cir. 1974), it seems appropriate to conceptually relate the two approaches with the following observations:

Causation is an essential element of any tort action. Properly considered, it has two elements: cause in fact and proximate cause. Cause in fact embraces both positive acts and passive conditions which have so contributed to the result that without them it would not have occurred. Cause in fact is often expressed as the "but for" test, and courts have felt a need to limit the "but for" test in its application. Materiality has often been a limiting factor in this test, and, as such, the test can be stated in broader terms as: "The defendant's conduct is a cause of the event if it was a material element and a substantial factor in bringing it about." W. Prosser, Law of Torts 240 (4th ed. 1971). "Under Rule 10b–5, the materiality and reliance requirements are best classi-

fied as cause in fact elements." Cobine, *supra* Note 9, at 656.

Proximate cause is a far more complex question because it involves questions of legal policy. "It has been suggested that the question of proximate cause is not really a question of causation at all, but rather a question of whether the defendant was under a duty to the plaintiff, or whether defendant's duty required him to protect plaintiff from the event which did in fact occur." Cobine, *supra*, Note 9 at 653. The proximate cause or duty question is answered in 10b–5 litigation by the rule itself: the defendant should not commit any of the acts proscribed in the rule in connection with the purchase or sale of any security.

Cause in fact and proximate cause (duty) are not new concepts in tort analysis. Both cause in fact and duty must be determined in each case. A tort analysis approach which stresses either one cannot properly decide a case at the total exclusion of the other.

19. Financial Indus. Fund, Inc. v. McDonnell Douglas Corp., 474 F.2d 514, 517 (10th Cir. 1973), *citing* Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90 (10th Cir. 1971) and Gilbert v. Nixon, 429 F.2d 348 (10th Cir. 1970).

have (1) caused both the decision to buy or sell and the damages, because (2) the value of the security was misrepresented and the (3) damages resulted merely from either the purchase or the sale. Unlike this hypothetical case, however, in the instant case it is necessary to make a distinction between reliance on the misrepresentations as they caused the investment decision and the misrepresentations as the cause of the damages sustained. The court finds that plaintiffs, in making their decision to invest, relied on the misrepresentation that Groesbeck would be Cinco Villa's general partner and that he would be personally investing in the venture.[20] The court is unable to conclude, however, that this misrepresentation was in any way connected to the damages claimed by plaintiffs. Although the misrepresentation was material and although it was relied upon by plaintiffs in making their decision to invest, the securities that were purchased were equal in value to the amount paid for them. It has not been shown that Groesbeck's misrepresentation in any way caused plaintiffs' alleged damages. That is, Groesbeck was under no duty which required him to protect plaintiffs from the events which did in fact cause the alleged damages.[21] This distinction is explained in applying the "out-of-pocket" theory of damages.

## DAMAGES

 Although there exists no rigid law of damages under Rule 10b–5,[22] actual damages based on the Securities Exchange Act of 1934 are measured by the "out-of-pocket rule." In Estate Counseling Service v. Merrill Lynch, Pierce, etc., 303 F.2d 527, 533 (10th Cir. 1962) the court stated:

> The failure to show actual damages is also a fatal defect in the cause of action based on the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq. That Act permits recovery of "his actual damages on account of the act complained of." "Actual damages," under the Federal rule of damages for fraud is the "out of pocket rule." In the Federal courts the measure of damages recoverable by one who through fraud or misrepresentation has been induced to purchase bonds or corporate stock, is the difference between the contract price, or the price paid, and the real or actual value at the date of the sale, together with such outlays as are attributable to the defendant's conduct. Or in other words, the difference between the amount parted with and the value of the thing received. [Citations omitted.]

> According to this theory, the question is not what the plaintiff might have gained, but what he has lost by being deceived into the purchase; the de-

20. The court concludes that although three of the plaintiffs had their own advisers review the information concerning the proposed venture that reliance can still be found since the advisers could have also relied on the alleged misrepresentations. The court, however, is unable to say, in view of the evidence presented, that plaintiffs' reliance was justified under the facts of this case. The location of the buildings and the identity of the general partner were inconsistently represented in the promotional material. If the contradictions and inconsistencies in the promotional material were so insignificant as not to be noted by the plaintiffs, then it is likely that plaintiffs relied on something other than the written materials. Of course, they could have relied totally on oral representations. The evidence showed that on December 29, 1969, and prior thereto, plaintiffs were so anxious to complete negotiations for income tax shelters that they recklessly ignored and disregarded much pertinent information supplied to them concerning Cinco Villa. At trial, each of the plaintiffs was, as to certain material facts testified to by him, uncertain, vague and contradictory.

21. *See* Note 24 infra.

22. In Mitchell v. Texas Gulf Sulphur, 446 F. 2d 90, 105 (10th Cir. 1971) the court stated:
> [B]ecause of the uniqueness of the litigation, it would be unwise to set forth a uniform rule [of damage awards] with broad applications to all securities cases.

fendant is liable to respond in such damages as naturally and proximately result from the fraud; he is bound to make good the loss sustained—such moneys as the plaintiff has paid out, with interest, and any other outlay legitimately attributable to the defendant's fraudulent conduct—but this liability does not include the expectant fruits of an unrealized speculation.

 The sales materials (Exhibits 2, 3, and 4) represented the purchase price of the Cinco Villa apartment complexes to be $280,000—the price the limited partnership ultimately paid for them. The apartment complexes had a market value equal to the $280,000 purchase price paid for them in late December, 1969, and they substantially retained such value thereafter as evidenced by plaintiffs' own appraiser's report obtained in December, 1971. Plaintiffs presented no evidence to show that there was any discrepancy between the price paid and the actual value at the date of the sale. This failure to show actual damages based upon the out-of-pocket rule as set forth above is a fatal defect in plaintiffs' case.

 Plaintiffs' complaint invalidly seeks a rescission remedy by claiming, contrary to the evidence, that the investment was totally worthless. When rescission is sought in actions of this nature, there is a promptness rule which requires the plaintiff to seek rescission as soon as fraud or misrepresentation is discovered. In Estate Counseling Service v. Merrill Lynch, Pierce, etc., *supra* at 532, the court stated:

In view of the speculative nature of the transaction and with a fluctuating market, the law required the appellant to act promptly or waive its right to rescind. Where parties have the right to rescind, they cannot delay the exercise of that right to determine whether avoidance or affirmance will be more profitable to them. This is particularly true where the transaction is one of a speculative nature. [Citations omitted.] So also where a party desires to rescind upon the grounds of misrepresentation or fraud he must, upon discovery of the fraud, announce his purpose and adhere to it.

Construing the evidence most favorably to plaintiffs' position, all plaintiffs had notice of the alleged misrepresentations by March or April of 1970 when they received from Cinco Villa the necessary information to file their 1969 income tax returns. In general, courts have been wary of claims for rescission, restitution, and equivalent damages in 10b–5 litigation.[23] To award such a remedy in this case, in which plaintiffs have delayed action for over two years after learning of the alleged misrepresentations, would allow plaintiffs to reap significant tax benefits while speculating on the future of their venture and then return to them the value of their initial investment when the venture failed. The securities laws contemplate no such investment guarantee. The basis of the requirement of immediacy of action by one who seeks rescission is the prevention of speculation. The radical relief sought by plaintiffs in this action is denied.[24]

## COMMON LAW FRAUD

The law of Utah is well settled as to the necessary elements of a common law action for fraud and deceit. Those elements are: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth;

23. Cobine, *supra* Note 9, at 670.

24. Counsel for defendants argued that the Cinco Villa venture failed because of possible mismanagement, rent and price controls, and the state of economy which influenced tenancy, etc. Although these arguments were poorly documented with evidence, plaintiffs did not offer evidence in opposition. Whatever the reason for the failure of the Cinco Villa venture, plaintiffs offered no evidence connecting the failure (which is the real measure of plaintiffs' damages, if any) with any of the alleged misrepresentations.

(5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance upon its truth; (8) his right to rely thereon; (9) his consequent and proximate injury. [Citations]. Estate Counseling Service v. Merrill Lynch, Pierce, etc., 303 F.2d 527, 532, (10th Cir. 1962).

█ Plaintiffs failed to prove these necessary elements by a preponderance of the evidence. Not unlike an action based on the Securities Exchange Act of 1934, "[a]ctions for fraud have failed because of lack of proof of damages." Id.

CARLIN–LEVY

Carlin, Levy and Company, Certified Public Accountants, are charged by plaintiffs as aiders and abetters in the alleged securities fraud primarily due to the tax impact opinion letter that was used in the sales of the limited partnership interests. The alleged misrepresentations in the tax impact letter concerned the location of the apartment complexes and represented Groesbeck as the general partner. At the close of the plaintiffs' case, Carlin-Levy moved to dismiss the action as against it pursuant to Fed.R.Civ.P. 41(b). This motion was taken under advisement at that time.

█ The court is well aware that Kerbs v. Fall River Industries, Inc., 502 F.2d 731 (10th Cir. 1974) states that under Rule 10b–5, "knowing assistance of or participation in a fraudulent scheme gives rise to liability equal to that of the perpetrators themselves" and that "one who aids and abets a fradulent scheme may be held accountable even though his assistance consists of mere silence or inaction." Id. at 740. However, plaintiffs have failed to prove by a preponderance of the evidence that Carlin-Levy either knew of the alleged fraudulent scheme or knew of the alleged misstatements in the tax opinion letter when issued. Rather, the evidence shows that the misrepresentation given to Mr. Levy by the Groesbeck organization on November 11, 1974, that Groesbeck was to be the general partner of Cinco Villa, accurately reflected the expectations of the Groesbeck organization as of that date. The subsequent change in the proposed general partner which resulted when A. J. Groesbeck Associates of Utah, Inc., was organized in December, 1969, could not have been reflected in the November 13, 1969, opinion letter. Plaintiffs have failed to present convincing evidence showing that Carlin-Levy could reasonably have been expected to know of the alleged fraudulent scheme. Therefore, Carlin-Levy's motion to dismiss is now granted and it is dismissed from the case.

█ No evidence was adduced at trial that would enable the court to make a separate finding concerning the liability of Peter Reid, the Groesbeck agent in Utah. Reid's liability is therefore determined in conjunction with Groesbeck and the Groesbeck organizations. The record is not clear whether some of the defendants are presently named as parties in bankruptcy proceedings in California. Judgment in this case, therefore, should be entered subject to modification if it is subsequently shown that all actions against any of the defendants have been stayed.

Based upon the foregoing, judgment should be rendered for defendants, no cause of action on plaintiffs' complaint.